2020 IL App (1st) 151735
Nos. 1-15-1735 & 1-17-2176, cons.
Opinion filed September 30, 2020

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 97 CR 23668(01) |
| LEON FIELDS, | ) ) | The Honorable Arthur F. Hill, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        This consolidated appeal involves two successive postconviction petitions by defendant Leon Fields, age 20, stemming from the same case. Defendant appeals from a second stage dismissal of one petition and from the trial court's denial of leave to file another petition.

¶ 2        Defendant was convicted by a jury of first degree murder and attempted first degree murder in connection with a shooting on July 19, 1997, which resulted in the death of Derryl Hood and a leg injury to Curtis Hood. Codefendant Rodney Toney, who opted for a

simultaneous bench trial, was acquitted. Defendant received consecutive sentences of 60 years and 20 years for first degree murder and attempted first degree murder, respectively.

¶ 3     Defendant's successive petitions assert a claim of actual innocence. In support, he attaches the affidavits of two witnesses, Renee Fitzgerald and Crystal Johnson, who averred that he was not one of the shooters. Fitzgerald's affidavit was attached to defendant's first successive petition, which was dismissed at the second stage; Johnson's affidavit was attached to his second successive petition, which defendant was denied leave to file.

¶ 4     For the following reasons, we reverse and remand for a third-stage evidentiary hearing.

¶ 5                                    BACKGROUND

¶ 6     At trial, the State's evidence included the testimony of two eyewitnesses, Deron James and Curtis Hood, who identified defendant as one of the shooters. In addition, the State presented other-crimes evidence showing that one of the guns used in the shooting matched a gun used in an earlier, unrelated shooting of Michael Welch, who testified that defendant shot him. The defense case included the testimony of an alibi witness, Mary Taylor, and the testimony of defense investigators, Mort Smith and Felicia Smith, that Curtis Hood had provided a pretrial statement recanting his prior identification of defendant to police.

¶ 7     Defendant was tried with codefendant Rodney Toney in a severed but simultaneous trial, where defendant was tried to a jury and Toney was tried to the court. The State's principal witnesses, Deron James and Curtis Hood, were both convicted felons and members of the Four Corner Hustlers gang. Deron James was in a wheelchair as the result of an earlier shooting.

¶ 8        The State's evidence established that on July 19, 1997, at 11:30 p.m., Derryl Hood,[1] Curtis Hood, and Deron James were standing in front of a nightclub on Madison Street in Chicago, talking to Jimmie Johnson, when Curtis Hood turned around and said, "Look out," there is "Shorty Light Skin." Curtis Hood testified that he observed five men, including defendant, approaching with guns. "Shorty Light Skin" is defendant's nickname. Derryl Hood pushed James out of James's wheelchair and onto the ground, immediately before the shooting began. James testified that before Derryl Hood pushed him out of his wheelchair, James observed defendant approaching. Curtis Hood ran and was shot in the leg. When Curtis Hood turned, he observed defendant standing over Derryl Hood as defendant shot Derryl Hood twice, once in the face and once in the neck. Similarly, James testified that he observed defendant shoot Derryl Hood twice. Both Deron James and Curtis Hood identified defendant as the shooter from a photo array the day after the shooting and from a lineup on August 5, 1997. Derryl Hood subsequently died from his wounds.

¶ 9        Eight months after the shooting, Curtis Hood signed a statement recanting his identification of defendant as one of the shooters. At trial, Curtis Hood testified that, on April 15, 1998, a man named Curtis Brown drove him, at gunpoint, to a McDonald's restaurant, where he met with defense investigator Mort Smith and Smith's assistant, Felicia Smith. Curtis Hood testified that Brown sat with him and held a gun against his side as he provided his statement. The gun was concealed in a pocket. Curtis Hood conceded at trial that he did not inform the defense investigators that Curtis Brown was holding a gun to his side.

---

[1]Since both victims, Derryl and Curtis, share the last name of Hood, we will refer to them by both their first and last names. Since there is later testimony concerning a Curtis Brown, we cannot simply use first names.

¶ 10    In his statement, which was admitted into evidence, Curtis Hood stated that he named defendant as one of the shooters because he "had a beef" with defendant and wanted "to get back" at him, but that defendant was not one of the shooters.

¶ 11    At trial, Curtis Hood recanted his pretrial statement to defense investigators. He testified that, after he returned home from the McDonald's restaurant, he called the police. Detective Richard Maher testified that Curtis Hood paged him the following day, April 16, 1998. Curtis Brown was subsequently charged with witness intimidation and acquitted of that charge.

¶ 12    Forensic investigator Carl Brasic, who was employed by the Chicago Police Department, testified that he recovered a total of ten 9 mm. and five .380 cartridge casings from the crime scene. Firearms examiner Lisa Peloza, who was employed by the Illinois State Police at the time of the offense,[2] testified that, based on her examination of the recovered firearm evidence, at least two separate 9 mm. handguns and one .380 caliber handgun were involved in this shooting. Peloza further testified that a 9 mm. handgun used in this shooting was also used in a prior shooting on January 11, 1997, involving a victim named Michael Welch.

¶ 13    Michael Welch, a convicted felon, testified that on January 11, 1997, defendant shot him twice and that, a year later, he identified defendant from a photo array and a lineup. Defendant was subsequently acquitted for the Welch offense.

¶ 14    Peggy Green testified that she was present at the scene of the shooting with her friend Renee Fitzgerald, but Green was unable to identify any of the shooters. Green testified that

---

[2]At the time of trial, Peloza was working at the Central Regional Crime Laboratory in Phoenix, Arizona.

Fitzgerald told her that Fitzgerald had "seen those people get shot." However, the defense objected to the hearsay, and the trial court sustained the objection. Green testified that a police officer heard Fitzgerald telling Green "what had happened" and then the officer "grabbed" them both and transported them to a police station. When Green was asked if she knew where Fitzgerald was "today," Green replied that Fitzgerald had "moved out of town."

¶ 15    In its case, the defense first called defense investigators Mort Smith and Felicia Smith, who had obtained Curtis Hood's statement before trial. Mort Smith testified that he knew Curtis Brown and that Curtis Brown was not present at the McDonald's restaurant that day. Felicia Smith testified that, when she and Mort Smith first arrived, Curtis Hood was sitting in a booth next to an African American male, but that this man ordered some food and left. Felicia Smith testified that Curtis Hood was relaxed while providing his statement.

¶ 16    Defendant's last witness was Mary Taylor, an alibi witness. Taylor testified that she was employed as a cargo agent with Globe Aviation, that there had been a basketball tournament on Saturday, July 19, 1997, and that, after the tournament, she was on her porch with her children and grandchildren and their friends, including defendant, from 10:30 p.m. to 1 a.m.

¶ 17    After listening to the evidence, closing arguments, and jury instructions, a jury found defendant guilty of first degree murder and attempted murder. After considering factors in aggravation and mitigation, the trial court sentenced defendant to consecutive terms of 60 years and 20 years, for a total of 80 years with the Illinois Department of Corrections (IDOC). This court affirmed his convictions and sentences on direct appeal. *People v. Fields*, No. 1-00-2650 (Ill. Aug. 20, 2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 18    On August 12, 2005, defendant filed his initial *pro se* postconviction petition alleging *Brady* violations. See *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (suppression by the prosecution of evidence favorable to an accused violates due process, irrespective of the good or bad faith of the prosecutor). Defendant alleged that the State failed to disclose that Michael Welch received a $25,000 payment from the State's Attorney's Victim Witness Assistance program.[3] This court affirmed the trial court's first-stage dismissal of his petition where the petition lacked supporting documentation. *People v. Fields*, No. 1-06-0006 (Ill. Aug. 31, 2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 19    On October 25, 2011, defendant moved to file a *pro se* successive postconviction petition alleging actual innocence. The trial court granted defendant's motion to file, and his counsel filed an amended petition supported by an affidavit by Fitzgerald.[4] In her affidavit, Fitzgerald averred that, immediately prior to the shooting, she observed "four dark-skinned adult men armed with guns" approaching the nightclub and that, "[a] few seconds" later, she heard gunshots and ducked down. Once the shooting stopped, Fitzgerald retrieved her friend Peggy Green from inside a nearby liquor store, and the two women returned to their vehicle. After a bystander informed the police that Fitzgerald had observed the shooting, the police placed both Fitzgerald and Green under arrest, handcuffing them and driving them to a police station. The officers stated that they were being arrested for disorderly conduct, although their conduct had not been disorderly. At the station, Fitzgerald was questioned by Detectives

---

[3]On September 29, 1999, defendant filed a pretrial motion for disclosure, stating that he believed that funds had been disbursed to one or more of the State's witnesses and seeking disclosure of those funds.

[4]Defendant submitted an affidavit by Fitzgerald with his *pro se* 2011 affidavit, and counsel submitted a second Fitzgerald affidavit with the subsequent amended petition in 2013. Since the State concedes in its brief that the second affidavit is "substantially the same as" the first affidavit, "only providing more details," we describe only the second affidavit above.

Mohan and Pollusky,[5] who showed her a photo of "a light-complected African American male who looked to be about 18 or 19." Although they asked her "to identify the subject of the photograph as someone [she] had seen on the street that night, [she] refused." Fitzgerald explained that the men she had observed "were older" and "much darker in skin tone." Although the "detectives became upset," they "eventually released" Fitzgerald and Green.

¶ 20          Fitzgerald further averred that, the following morning, she was driving down the street when the two detectives stopped her and "commanded" her to follow them back to the police station. They showed her the same photo and were "pressuring" her to identify "the boy" in the photo as one of the shooters. The detectives told Fitzgerald "that they knew who [she] was and that they knew the father of [her] children was a man named Willie Lloyd and that he was a Chief of a street gang. They threatened that if [she] did not cooperate, [she] would lose her children to DCFS."

¶ 21          Fitzgerald averred that, on the following Monday, July 21, 1997, she had her third encounter with the same detectives. They forced their way through a gate in her mother's fenced yard and stated " 'B***, you're going to testify for us, whether you like it or not." The detectives were so loud that her mother came outside and told them that if they did not exit her property, she would file a complaint.

¶ 22          Her fourth encounter with the same two detectives occurred in the middle of August, when they "grabbed" her, transported her to the police station, and again "threatened that if [she] did not cooperate, [she] would lose [her] children to DCFS." Fitzgerald averred:

"I was distraught and fearful that the detectives would in fact be able to have my children taken away if I did not go along with their demands. I believed at this point

---

[5]The affidavit does not provide the detectives' first names. However, a Detective Richard Maher and a Detective John Pallohusky both testified at trial.

that if I wanted to keep my children and not be continually hunted and harassed by these detectives, I had no other option but to identify the boy in the picture."

¶ 23    Fitzgerald averred that the detectives came looking for her again but she was able to avoid them because she did not want to testify. She hoped that the identification would be enough such that the police would not cause her to lose her children, but she lost custody anyway. Fitzgerald moved to Minnesota in order "to get past this whole ordeal."[6] After several years in Minnesota, she returned to Illinois and attended a funeral in 2009 where she encountered defendant's mother. When defendant's mother showed her a photo of her son, Fitzgerald recognized him as the same boy in the photo that the detectives had kept showing her.

¶ 24    In conclusion, Fitzgerald averred:

> "I did not see [defendant] on July 19, 1997. I saw the four gunmen none of whom was [defendant] and none of whom even resemble [defendant]. I made a false identification of [defendant] as one of the gunmen because and only because of threats and harassment from the police. It is my certain belief that [defendant] is innocent of this crime."

Defendant's amended petition included a copy of the program for the funeral that Fitzgerald averred that she attended.

¶ 25    On April 21, 2015, the trial court granted the State's second-stage motion to dismiss. The court stated only "[t]hat the Defendant, the Petitioner, hasn't brought forward enough to satisfy the dictates of actual innocence. Also the cause and prejudice test is not met." On May

---

[6]Fitzgerald's affidavit does not state when she moved to Minnesota.

21, 2015, defendant filed a timely notice of appeal that was assigned appeal number 1-15-1735.

¶ 26     On January 18, 2017, defendant moved for leave to file a second *pro se* postconviction petition asserting actual innocence. His petition was supported by an affidavit from Crystal Johnson in which she averred that she had observed the shooting, that she knew defendant from the neighborhood, and that defendant was not one of the shooters. Johnson averred, in relevant part:

"While talking with some people on the sidewalk not that far from [the nightclub], about 4 guys in dark clothes walked by with guns and started shooting. I ran in the opposite direction eventually making it to my home. Later I learned that Daryl Hood had been killed that night on Madison. I knew Daryl Hood from the area because he and his so call[ed] people controlled the gang in my neighborhood.

During December of 2015, I got in contact with an old friend, Tiffany Thomas. We ended up talking about a childhood friend of her and her family name Kerry who's in jail which they thought would be coming home soon.

During our conversation, it became clear that she was speaking about the night at [the nightclub] in the summer of July, 1997. I informed her that I saw the guys walk past me that night. It was 4 guys wearing dark clothing carrying guns. To make sure we were talking about the same Kerry, Tiffany had me look up a picture of [defendant] (Kerry) on the [IDOC] website. [Defendant] (Kerry) pretty much looked the same as he did approximately 20 years ago. After verifying his identity, I'm 100% sure that Kerry wasn't one of the shooters that I saw walking on the sidewalk that night on Madison Street ***."

Defendant's petition also included an affidavit from Tiffany Thomas corroborating Johnson's description of Johnson's conversation with Thomas and a copy of Fitzgerald's previously submitted affidavit.

¶ 27 On June 9, 2017, the trial court denied defendant leave to file. In its written order, the trial court found that Johnson's affidavit was both newly discovered and noncumulative, and thus, the first two prongs of the actual innocence test were satisfied. However, the trial court found that Johnson's affidavit, by itself, was not of such a conclusive character that it would change the result at trial. The trial court gave three reasons. First, the affidavit did not specify the exact date of the shooting. Second, although Johnson averred that she witnessed four men with guns "shooting," she did not specifically state that she observed the victims being shot. Lastly, the State's evidence at trial was overwhelming.

¶ 28 On September 26, 2017, this court allowed defendant's late notice of appeal and assigned it appeal number 1-17-2176. On January 24, 2019, defendant moved to consolidate appeal numbers 1-15-1735 and 1-17-2176 on the ground that they "concern precisely the same subject matter: the denial of [defendant's] successive postconviction petitions containing claims of actual innocence based on newly discovered evidence." This court granted defendant's motion, and this consolidated appeal followed.

¶ 29                                    ANALYSIS

¶ 30                          I. An Actual Innocence Claim

¶ 31 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq* (West 2018)) contemplates the filing of "[o]nly one petition *** without leave of the court." 725 ILCS 5/122-1(f) (West 2018); *People v. Sanders*, 2016 IL 118123, ¶ 24. Any claim not in the original petition, or an amended version of it, is waived. 725 ILCS 5/122-3 (West 2018);

*Sanders*, 2016 IL 118123, ¶ 24. However, this bar against successive petitions is overcome if defendant can (1) satisfy the *Pitsonbarger* cause and prejudice test (*People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002); 725 ILCS 5/122-1(f) (West 2018)) or (2) show evidence of actual innocence. *Sanders*, 2016 IL 118123, ¶ 24. In the case at bar, defendant claims actual innocence.

¶ 32    The evidence supporting an actual-innocence claim must be (1) new, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Allen*, 2015 IL 113135, ¶ 22; *People v. Coleman*, 2013 IL 113307, ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. "Material means the evidence is relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. To be material, the evidence "need not, standing alone, exonerate the defendant; rather, it must tend to 'significantly advance' his claim of actual innocence." *People v. Stoecker*, 2014 IL 115756, ¶ 33. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. Conclusive means that the additional evidence, "when considered along with the trial evidence, would probably lead to a different result." *Coleman*, 2013 IL 113307, ¶ 96. "Probability, not certainty, is the key ***." *Coleman*, 2013 IL 113307, ¶ 97. A piece of new evidence is conclusive if it "would probably change the result on retrial, either by itself or in conjunction with" other new evidence also presented by the petitioner. *Sanders*, 2016 IL 118123, ¶ 53; *Coleman*, 2013 IL 113307,

¶¶ 104-08 (considering together the statements of all the new witnesses presented by defendant).[7]

¶ 33                                    II. Standard of Review

¶ 34         With respect to one of defendant's successive petitions, he is first seeking leave of court to file it. "[L]eave of court to file a successive postconviction petition should be denied only where it is clear from a review of the petition and attached documentation that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Sanders*, 2016 IL 118123, ¶ 24. It is presumed that the new evidence will contradict the evidence of defendant's guilt at trial; otherwise "the purpose of the Act would be rendered meaningless." *Robinson*, 2020 IL 123849, ¶ 57. "For new evidence to be positively rebutted" at the leave-to-file stage, "it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where" the trial record "affirmatively and incontestably demonstrate[s]" the new evidence "to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. As an example of what would rise to the level of false or impossible, the supreme court cited a case where the new evidence asserted that the victim had been shot only once, but the autopsy evidence at trial established that he had been shot multiple times. *Robinson*, 2020 IL 123849, ¶ 59 (discussing *Sanders*, 2016 IL 118123, ¶ 59). Once leave to file a successive petition is granted, it is docketed for second-stage proceedings. *Sanders*, 2016 IL 118123, ¶ 28.

---

[7]In its brief to this court, the State cited *People v. Savory*, 309 Ill. App. 3d 408, 415 (1999), for the proposition that evidence of actual evidence is evidence that totally exonerates a defendant. However, our supreme court "specifically rejected the total vindication or exoneration standard" set forth in that appellate case. *Robinson*, 2020 IL 123849, ¶ 55 (citing *People v. Savory*, 197 Ill. 2d 203, 213 (2001) (specifically rejecting the "complete vindication" standard set forth in the lower court's opinion)).

¶ 35    One of defendant's two petitions was dismissed at the second stage. The issue at the second stage is whether the petitioner made "a substantial showing of actual innocence such that an evidentiary hearing is warranted." *Sanders*, 2016 IL 118123, ¶ 37. At the second stage, the allegations in the petition are "liberally construed in favor of the petitioner." *Sanders*, 2016 IL 118123, ¶ 31. "All well-pleaded factual allegations must be taken as true." *Sanders*, 2016 IL 118123, ¶ 37. "[T]here are no factual issues" at the second stage. *Sanders*, 2016 IL 118123, ¶ 31. "Credibility determinations may be made only at a third-stage evidentiary hearing." *Sanders*, 2016 IL 118123, ¶ 42.

¶ 36    At the second stage, a court considers only the proofs attached by defendant to his petition and the record of his original trial proceedings. *Sanders*, 2016 IL 118123, ¶¶ 45, 48. The Act specifically requires the petitioner to attach to his petition "affidavits, records or other evidence supporting the petition's allegations or state why the same are not attached." *Sanders*, 2016 IL 118123, ¶ 45 (citing 725 ILCS 5/122-2 (West 2014)). The court must accept as true both the petition's allegations and its supporting evidence "unless they are positively rebutted by the record of the original trial proceedings." *Sanders*, 2016 IL 118123, ¶ 48. By the record, the Act means " 'the court file of the proceeding *** and any transcripts of such proceeding.' " *Sanders*, 2016 IL 118123, ¶ 43 (quoting 725 ILCS 5/122-2.1(c) (West 2014)); see also *Robinson*, 2020 IL 123849, ¶ 45 ("the trial record").

¶ 37    When no evidentiary hearing is held, a reviewing court's standard of review is *de novo*. *Sanders*, 2016 IL 118123, ¶ 31. Thus, our standard of review with respect to both petitions is *de novo*. *Robinson*,2020 IL 123849, ¶¶ 38-39 ("the denial of leave to file a successive postconviction petition premised on a claim of actual innocence" is *de novo*); *Sanders*, 2016 IL 118123, ¶ 31 (a second-stage dismissal is reviewed *de novo*). *De novo*

13

consideration means that we perform the same analysis that a trial judge would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 38                                    III. Newly Discovered

¶ 39        Although defendant attached other affidavits to his petitions, he argues on appeal only that the affidavits of Renee Fitzgerald and Crystal Johnson are (1) newly discovered and (2) material and noncumulative. Thus, we consider only these affidavits on appeal. Points not argued are waived. *People v. Cardona*, 2013 IL 114076, ¶ 19; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 40        In addition, the State did not argue in its brief to this court that Johnson's affidavit was not newly discovered or that the trial court was incorrect in finding that it was. Again, points not argued are waived. *Cardona*, 2013 IL 114076, ¶ 19; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). At oral argument before this court, the State conceded that Johnson's affidavit was, in fact, newly discovered. Thus, we must determine only whether Fitzgerald's affidavit was newly discovered.

¶ 41        In support of its argument that Fitzgerald's affidavit was not newly discovered, the State attached material that was not part of the court file to its motion to dismiss and argued this material during oral argument before this court. As we noted above, when considering a petitioner's supporting documents at the second stage, we accept them as true, "unless they are positively rebutted by the record of the original trial proceedings." *Sanders*, 2016 IL 118123, ¶ 48. By the record, the Act means " 'the court file of the proceeding *** and any transcripts of such proceeding.' " *Sanders*, 2016 IL 118123, ¶ 43 (quoting 725 ILCS 5/122-2.1(c) (West 2014)); see also *Robinson*, 2020 IL 123849, ¶ 45 ("the trial record"). In a

14

footnote in its brief to this court, the State argues that it would be unfair to bar the State from submitting evidence at this stage.

¶ 42        The purpose of the first two stages is to determine whether an evidentiary hearing is even necessary. To the extent that the State believes that it must introduce other evidence to counter defendant's claims, then it may introduce that material at a third-stage evidentiary hearing. That is what an evidentiary hearing is for.

¶ 43        Unlike the State, a defendant is required by statute to attach supporting affidavits and documents to his petition. *Sanders*, 2016 IL 118123, ¶ 45 (citing 725 ILCS 5/122-2 (West 2014)). The court's task is to consider the material he submitted against the court file and trial transcripts in order to decide whether an evidentiary hearing is even warranted. Thus, we do not consider, at this early stage, any other materials.

¶ 44        The State also argues that the court file establishes that the defense knew prior to trial that Fitzgerald was a possible witness, since she was listed on the State's answer to discovery.[8] On December 4, 1997, which was almost two years prior to the start of trial, defendant moved for the preservation and production of handwritten interview notes by the police concerning a number of individuals, including Fitzgerald. Defendant's motion stated that "[t]he State has previously produced documents containing interviews with" Fitzgerald, among others. However, what this motion establishes is that the defense knew Fitzgerald was a possible State witness and, at this time, she was still identifying defendant as a shooter.

¶ 45        Defendant argues that Fitzgerald's move rendered her unavailable and that no due diligence on defendant's part could have made her testify, in light of her fears and the

---

[8]The State's answer to discovery, listing Fitzgerald, is not in the record, and the State's brief does not provide a record cite for it. However, the record shows that the defense knew she was a possible witness, since the defense sought the police's handwritten notes concerning her.

intimidation by the police, which we must accept as true at this stage. In response, the State argues that neither the record nor Fitzgerald's affidavit bears this out.

¶ 46        Newly discovered evidence is evidence that could not have been obtained earlier through due diligence. See *Coleman*, 2013 IL 113307, ¶ 96. It includes testimony from a witness who "essentially made himself [or herself] unavailable as a witness" by moving out of state (*People v. Ortiz*, 235 Ill. 2d 319, 334 (2009)) or who had been made unavailable through threats or intimidation to not testify. *People v. White*, 2014 IL App (1st) 130007, ¶¶ 20-22. For example, in *People v. Harper*, 2013 IL App (1st) 102181, ¶ 42, the witness's affidavit "attested that his trial testimony was a lie and that police officers threatened him to obtain the testimony." This court found, "[c]learly, due diligence could not have compelled [the witness] to testify truthfully." *Harper*, 2013 IL App (1st) 102181, ¶ 42; see also *People v. Smith*, 2015 IL App (1st) 140494, ¶ 19 ("no amount of due diligence would have allowed [defendant] to secure [the eyewitness'] recantation of his identification prior to trial").

¶ 47        The record establishes first that State witness Peggy Green testified that Fitzgerald moved out of town prior to trial. Second, Green's trial testimony finds some support in the court file. On September 10, 1999, defendant moved for disclosure on the ground that, the day before in open court, the State had indicated that one or more of its witnesses was "out of town" but that the State's prior answer to discovery did not indicate any out-of-town witnesses. We do not have a transcript for September 9, 1999; thus, the record does not disclose which State witnesses, if any, had moved. Although Fitzgerald's affidavit does not state when she moved out of town, this document lends some corroboration to Green's trial testimony that Fitzgerald had moved out of town prior to trial. Third, Fitzgerald's affidavit avers that she successfully hid from the police to avoid testifying at trial. She averred that she

moved out of town to leave behind "this ordeal" of police intimidation and threats[9] to take her children, which ultimately succeeded. Lastly, to the extent that defendant was aware of Fitzgerald as a witness, she had demonstrated no intent of recanting her pretrial identification to the police at the time of trial, and defendant had no reason to suspect that the reason for her false identification in the first place was threats and intimidation by the police. See *Harper*, 2013 IL App (1st) 102181, ¶ 42.

¶ 48        In an actual innocence claim, it is "the evidence in support of the claim" that "must be 'newly discovered,' " not necessarily the source. See *People v. Edwards*, 2012 IL 11171, ¶ 32.   As a result, an affidavit from a witness may be newly discovered, even when the defense knew of the witness prior to trial. *White*, 2014 IL App (1st) 130007, ¶ 20. If "no amount of [due] diligence by defendant could have compelled [the witness] to testify to the statements in his affidavit" at trial, then the affidavit constitutes newly discovered evidence. *White*, 2014 IL App (1st) 130007, ¶ 22.

¶ 49        For the foregoing reasons, we find that the statements in Fitzgerald's affidavit were newly discovered.

¶ 50                              IV. Material and Noncumulative

¶ 51        As we observed above, material evidence is evidence that is relevant and probative of the defendant's innocence, and noncumulative means that it adds to what the jury heard. *Coleman*, 2013 IL 113307, ¶ 96.

---

[9]We are not finding that Fitzgerald's statements of police intimidation are true, but rather we must accept them as true at this stage of the proceedings.

¶ 52    Fitzgerald's and Johnson's affidavits are material and noncumulative because now two eyewitnesses would testify that defendant was not one of the shooters, whereas no eyewitness testified to that at his original trial.

¶ 53    The State claims that Fitzgerald's affidavit was not material, arguing, first, that she never averred in her affidavit that defendant was not present. This is incorrect. Fitzgerald stated: "I again affirm that I did not see [defendant] on July 19, 1997." Second, the State argues that she did not observe the shooting itself. Fitzgerald averred: "I saw four dark-skinned adult men in hoodies armed with guns approaching *** toward the club entrance. A few seconds after I saw the men, I heard what sounded like gunshots and immediately ducked down." In light of the short time frame of just "a few seconds," her observations are still material. *Sanders*, 2016 IL 118123, ¶ 31 (we construe defendant's allegations "liberally" and in his "favor").

¶ 54    With respect to Johnson's affidavit, the State argues, first, that Johnson did not observe the shooting. This is incorrect. Johnson averred that she observed four men "shooting." Second, the State argues that her affidavit is not material because it did not provide the exact date of the shooting, describing the date only as a night in July 1997. However, her affidavit left no doubt which date she was describing, since she averred that she later learned that it was the night Derryl Hood was killed. While this might be a source for cross-examination, it is not a sufficient basis to find her affidavit immaterial. Thus, we find that both affidavits are material and noncumulative.

¶ 55                            V. Of a Conclusive Character

¶ 56    Lastly, we consider the probability of the new evidence to "change the result on retrial either by itself or in conjunction with" other new evidence also presented by the

18

defendant. *Sanders*, 2016 IL 118123, ¶ 53; *Coleman*, 2013 IL 113307, ¶¶ 104-08 (considering together the statements of all the new witnesses presented by defendant).

¶ 57     At a retrial, defendant would have potentially two eyewitnesses testifying that he was not one of the shooters, in addition to the alibi witness whom he previously called. At this stage, we accept the eyewitnesses' averments as true. See *Sanders*, 2016 IL 118123, ¶ 48. At a retrial, their credibility would be judged against the State's evidence. State witness Curtis Hood identified defendant but then recanted to defense investigators and recanted again at trial when he recanted the recantation. These repeated about-face reversals make him not the strongest witness. As for Michael Welch's testimony, it is questionable what impact it would have as other-crimes evidence at a retrial, in light of defendant's subsequent acquittal of that offense. See *People v. Ward*, 2011 IL 108690, ¶ 49 (the trial court abused its discretion by refusing to admit evidence of an acquittal where the offense had been introduced as other-crimes evidence). It is not even certain that it would be admissible, in light of the fact that the trial court would have to carefully weigh its probative value against its undue prejudice. 725 ILCS 5/115-7.3 (West 2018); *Ward*, 2011 IL 108690, ¶ 35.

¶ 58     Defendant asks us to take judicial notice of his acquittal in the Welch offense, and we do. Illinois Rules of Evidence permit a court to "take judicial notice, whether requested or not." Ill. R. Evid. 201(c) (eff. Jan. 1, 2011). "A judicially noticed fact must be one not subject to reasonable dispute ***." Ill. R. Evid. 201(b) (eff. Jan. 1, 2011). Although the State asks us not to take judicial notice, it does not dispute that the acquittal occurred. Thus, this fact is not apparently subject to reasonable dispute. See *Koshinski v. Trame*, 2017 IL App (5th) 150398, ¶ 10 ("the circuit court's orders are proper materials for judicial notice"); *People v. Alvarez-*

*Garcia*, 395 Ill. App. 3d 719, 726-27 (2009) (the appellate court may take judicial notice of records kept by Illinois courts).

¶ 59        In sum, for identification evidence at a retrial, the State would be relying primarily on the testimony of Deron James. At a retrial, a factfinder would have to weigh the testimony of this convicted felon and gang member against the testimony of defendant's three exonerating witnesses—namely, the two eyewitnesses and one alibi witness.

¶ 60        To the extent that the State argues that Fitzgerald's affidavit is not credible because "recantation testimony" is suspect, this argument is a double-edged sword for the State. *Sanders*, 2016 IL 118123, ¶ 33 ("recantation testimony is regarded as inherently unreliable"). At trial, Curtis Hood recanted his prior signed statement to defense investigators, which itself was a recantation of the prior identification that he provided police. In addition, Fitzgerald has yet to testify, so she cannot be accused of testifying falsely.

¶ 61        The State argues that, since Curtis Hood testified that there were five shooters while Fitzgerald and Johnson averred there were only four, it is possible that Fitzgerald and Johnson overlooked a fifth man, who could have been defendant. However, Johnson averred that she observed the men "shooting" and there were only four of them. Thus, defendant's new evidence directly contradicts the State's evidence at trial and creates a credibility contest that needs to be resolved at a hearing and by a factfinder, which this court is not. "Credibility determinations may be made only at a third-stage evidentiary hearing." *Sanders*, 2016 IL 118123, ¶ 42. At this early stage, we construe defendant's allegations "liberally" and in his "favor." *Sanders*, 2016 IL 118123, ¶ 31.

¶ 62        For the foregoing reasons, we find that defendant has made a substantial showing that the new evidence has the probability to lead to a different result at retrial. *Sanders*, 2016 IL

118123, ¶ 37 (the issue at the second stage is whether the petitioner made "a substantial showing of actual innocence such that an evidentiary hearing is warranted").

¶ 63     In the interests of judicial economy, and in light of the fact that defendant appended both the Fitzgerald and Johnson affidavits to his last petition, we reverse and remand both petitions for a third-stage evidentiary hearing. *People v. Buffer*, 2019 IL 122327, ¶ 47 (an appellate court may act "[b]ased on the particular issue raised *** in the interests of judicial economy"); *People v. Ames*, 2019 IL App (4th) 170569, ¶ 21 ("considerations of judicial economy *** apply with equal force in the appellate court").

¶ 64                                      CONCLUSION

¶ 65     In conclusion, we reverse and remand for a third-stage evidentiary hearing.

¶ 66     Reversed and remanded.

**No. 1-15-1735**

| | |
|---|---|
| **Cite as:** | *People v. Fields*, 2020 IL App (1st) 151735 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 97-CR-23668(01); the Hon. Arthur F. Hill Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Christopher G. Evers, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Annette Collins, Assistant State's Attorneys, of counsel), for the People. |