NOTICE
Decision filed 01/26/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200261-U

NO. 5-20-0261

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 10-CF-694 |
| | ) | |
| TREVIS S. THOMPSON, | ) | Honorable |
| | ) | Michael A. Fiello, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*: The defendant's motion for leave to file a successive postconviction petition and supporting documentation set forth a colorable claim of actual innocence such that the trial court should have granted the defendant leave to file a successive postconviction petition.

¶ 2   The defendant, Trevis S. Thompson, was found guilty by a jury of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)), aggravated battery (720 ILCS 5/12-4(a) (West 2010)), and mob action (720 ILCS 5/25-1(a)(1) (West 2010)) in relation to the death of Orlando Clark. This appeal involves the trial court's denial of the defendant's motion for leave to file a successive postconviction petition. The defendant contends that the trial court erred because he presented a colorable claim of actual innocence. For the following reasons, we vacate the judgment of the trial court and remand this matter for further proceedings.

1

¶ 3                          I. BACKGROUND

¶ 4    On the evening of November 19, 2010, a new establishment in Carbondale, Illinois, was having a "soft opening" event. Because the establishment did not have its liquor license in place for the event, many of the attendees were drinking outside in the parking lot after purchasing alcohol from nearby stores. At approximately 1:15 a.m., on November 20, 2010, an announcement was made that the owner of the parking lot next door to the club was having parked cars towed off its lot. Many of the patrons started leaving the club to move their vehicles. At about the same time, the parking lot became the scene of numerous fights. According to various witnesses, at one point, there were over 50 people in the parking lot either fighting or spectating.

¶ 5    One of the patrons at the club, Marshare Adams, testified that as she was leaving the club, the defendant came up to Adams and snatched $5 from her hand. She followed the defendant outside to an SUV, owned by codefendant Patrick Greene, the defendant's cousin. Adams demanded her money back. Greene jumped out of the vehicle and started yelling at Adams. Another patron, Jeremy Clark, saw Adams, Greene, and the defendant arguing. Jeremy continued watching as a crowd began to gather around them. Jeremy then saw his cousin, Orlando Clark, approach Greene. Orlando and Greene exchanged words and then punches. Jeremy then lost sight of the altercation with Greene, as Jeremy became involved in his own fight with someone else. Jeremy subsequently learned that the defendant and Greene were fighting with Orlando by the wall of a nearby building. Orlando's girlfriend, Regina Labotte, was yelling for help. As Jeremy ran toward Orlando, he saw the defendant and Greene run away.

¶ 6    Another witness, Courtney Williams, testified he saw Adams and Greene arguing by Greene's SUV. The defendant was seated inside Greene's vehicle. Williams then observed Orlando, the victim, attempt to break up the argument. According to Williams, the defendant got

2

out of the vehicle with a blade in his hand. When another individual, Antonio Pugh, attempted to break up the fight, Williams witnessed the defendant stab Pugh. Williams then became involved in yet another fight but saw the defendant and Greene running after the victim. According to Williams, the defendant was swinging a blade. Once they reached the wall of a nearby building, Williams saw the defendant make "jabbing" motions at the victim. Williams further testified that the victim fell to the ground. After the victim fell to the ground, Greene hit the victim over the head with empty liquor bottles before leaving the area. Williams described the weapon used by the defendant as a dark flip out blade made of chrome.

¶ 7    Timothy Oats, the victim's first cousin, witnessed the victim and Greene begin to argue and saw the defendant enter Greene's SUV. Greene and the victim then got into a physical fight, and Oats began fighting with someone named "Torri." Oats testified that he saw the defendant exit the passenger side of the vehicle, with a silver object in his hand, and head toward Greene and the victim. Oats then lost sight of the fight between Greene and the victim. When Oats next saw the victim, he was lying against a building, with Regina Labotte standing over him. Oats did not see the defendant stab or "take any physical action" toward the victim. Oats did not see anyone else with a weapon.

¶ 8    The victim's girlfriend, Regina Labotte, testified that she had known the defendant since he was a little boy because she had been friends with his mother for 16 or 17 years. On the night of the murder, she witnessed Greene and the victim fighting. Labotte saw Greene in front of Orlando, the victim, by the wall, and the two men were punching each other. The defendant was standing near the victim's left side, facing the victim, who was cornered against the wall. The defendant stabbed at the victim with jabbing motions. Labotte ran toward them screaming, and the defendant turned to run away. Labotte watched the victim drop to one knee. Greene picked up two

3

bottles and began hitting the victim on the head. Labotte threw herself on top of the victim and begged Greene to stop hitting Orlando. Greene dropped the bottles and ran away. Labotte tried to help the Orlando up, but he was unable to stand. She noticed his breathing growing shorter and then stop. At this point, the police arrived, followed by paramedics.

¶ 9    Police officers began arriving at the club at approximately 1:20 a.m. The scene was described as "chaotic" and near "riot conditions." The victim was found seated against a wall, shirtless and bleeding from several wounds. There were pools of blood on the ground and blood sprayed on the wall. CPR was attempted, with little success. The paramedics soon discovered a large gaping wound in the victim's left thigh, with blood spurting from the wound whenever chest compressions were administered.

¶ 10    The forensic pathologist who examined the victim testified that he had seven short force injuries to his body, caused by a knife or knife-like instrument. Some of the victim's wounds were stab wounds and some were cutting wounds. The wound to the left thigh was described as both a cutting and stab wound. This wound was 3.54 inches long, 1.97 inches wide, and 1 to 1.5 inches deep. The victim's femoral artery was severed. The pathologist concluded that the victim died of exsanguination, primarily from the wound to his left thigh, and that the other wounds would not have been fatal. The pathologist testified that severing the femoral artery on the thigh would have caused blood to spurt out with some force from that wound, although it might have been blocked somewhat by the victim's clothing.

¶ 11    Some of the police officers who arrived on the scene began looking for witnesses and suspects. Two of these officers followed a group of men who the officers had observed walking down an alley off the lot. The group included the defendant and Greene. They refused to stop when commanded to do so. At the entrance of the alley, the group split up and fled in different directions.

4

The defendant and Greene were subsequently apprehended. During the course of the investigation, several items of clothing were seized from the defendant and from the scene. Although the victim's DNA was not found on any of the defendant's clothing, Pugh's DNA was found in bloodstains on the defendant's shoes and t-shirt. The victim's DNA was found in bloodstains on Greene's jeans and the inside of Greene's sweatshirt.

¶ 12    Dee Cross, a crime scene investigator, testified regarding her efforts to collect evidence from the crime scene on the night of the incident. She, along with several other investigators, took photographs and collected various items of evidence from the scene. Cross and another evidence technician returned to the crime scene two days later to search the surrounding area for the murder weapon, which had not been previously located. During their search, the evidence technician found a blue box cutter under a bush, near the dumpster, in a parking lot, south of the crime scene. Cross photographed the box cutter, which had debris on it and was surrounded by leaves. With gloved hands, she picked up the box cutter, opened it, and saw that it was rusty with no visible signs of blood. She did not collect the box cutter as evidence. That same morning, Cross also found a vodka bottle with no visible evidence of blood on it. The bottle was not collected as evidence. Cross testified that she does not write reports on evidence not collected and that she is allowed to make judgment calls when collecting items. Based on her judgment, Cross did not believe the box cutter, or the bottle, had anything to do with the case.

¶ 13    The defendant testified to the following. On the night of the incident, he had spent the evening riding around with friends before ending up at the club's parking lot. He went inside the club a couple of times over the course of the evening. The last time the defendant left the club, he ran into Adams, who was intoxicated. She asked the defendant for some money, and he pulled some from his pocket. Adams grabbed more money than the defendant intended to give her, and

5

the defendant took the money back. The defendant and Adams started "playing around" and "wrestling," and the defendant fell backwards and hurt his ankle. He left the club and returned to Greene's SUV for a ride home. Adams followed, still asking for money. According to the defendant, someone opened the door of Greene's SUV while the defendant was sitting inside the vehicle and pulled him out. The defendant testified that Oats began fighting with the defendant soon after he was pulled from the truck, and he was slammed to the ground. The defendant claimed that he left the parking lot after fighting with Oats. The defendant explained that there were a lot of people around him when he left the area. He went north until he was apprehended at a nearby liquor store.

¶ 14    The defendant denied getting into a fight with the victim or stabbing the victim that evening. He also denied having a knife on him and had no recollection of the victim being stabbed. The defendant further denied stabbing Pugh and could not explain how Pugh's blood was found on the defendant's shoe and shirt. During the fight, the defendant suffered two stab wounds to his left arm but did not know how it happened or who stabbed him.

¶ 15    The jury found the defendant guilty of first degree murder, aggravated battery, and mob action. The jury found Greene guilty of aggravated battery and mob action but not guilty of first degree murder. The trial court denied the defendant's posttrial motions and sentenced him to 50 years in prison. The defendant appealed. This court affirmed the defendant's conviction and sentence. See *People v. Thompson*, 2014 IL App (5th) 110290-U.

¶ 16    The defendant subsequently retained postconviction counsel to file the defendant's initial postconviction petition. Following a third-stage hearing on some of defendant's postconviction claims, the trial court denied the defendant's postconviction petition and a motion to reconsider

6

filed by the defendant. This court affirmed the trial court's judgment. *People v. Thompson*, 2022 IL App (5th) 190317-U.

¶ 17    While the appeal of the denial of his postconviction petition was pending, the defendant filed a motion for leave to file a successive postconviction petition. In this motion, the defendant alleged that he was actually innocent, that the prosecuting attorney violated Ethics Rule 3.8, and that he was denied effective assistance of postconviction counsel. The defendant attached multiple exhibits to his motion, including the affidavits of codefendant Greene, Juanita Bradsfield (the defendant's mother), Jalen Cobb, and Desmond Shauf.

¶ 18    In support of his claim of actual innocence, the defendant alleged that affidavits from Greene, Bradsfield, Shauf, Cobb, and Halston Lewis[1] called into question the testimony of Labotte and Williams by providing a "firsthand account" of what occurred between Greene and the victim. The defendant also alleged the affidavits showed that Labotte and Williams lied during trial and had a reason to not tell the truth. The defendant generally asserted that the evidence was newly discovered and could not have been previously discovered. The defendant further asserted that the evidence was material, noncumulative, and of such a conclusive character that it would probably change the result on retrial. In support of his ineffective assistance of counsel claim, the defendant alleged that his mother had previously given the affidavits of Greene and Lewis to postconviction counsel, who chose not to use those affidavits in support of the defendant's postconviction petition.

¶ 19    Greene's affidavit provided as follows. At trial, Greene was acquitted of the victim's murder. He had intended to raise a self-defense claim at trial, but on the advice of counsel, Greene

---

[1]No affidavit from Halston Lewis was attached to the motion for leave to file a successive postconviction petition. According to the defendant, his mother had given the affidavit to postconviction counsel for the defendant's initial postconviction petition, but the affidavit was never returned to the defendant or his mother.

7

chose not to testify. He averred that he came forward and submitted this affidavit because he could "no longer allow *** [the defendant] to continue to be incarcerated for something he did not do." In his affidavit, Greene indicated that he was offered a plea deal if he testified that the defendant committed the murder but declined to do so because he was "not going to lie in order to get a deal."

¶ 20 According to Greene's affidavit, at approximately 1 a.m. on the date of the incident, he was standing by his truck in the parking lot of the club. While standing there, a group of men approached Greene and began "arguing at" him. One of the men stated, "you have a big a** mouth and you need me to close it." The unidentified man punched Greene in the face and a fight ensued. The man's family joined the fight. Greene was punched and kicked repeatedly. In an attempt to get away, Greene ran away from the location of the fight, and his shirt was torn from him. The group of men chased after Greene. As he reapproached his truck, he observed the men charging him, and they surrounded him. The same unidentified man who initially punched Greene was swinging his arms. Greene fell back and felt something "stick" him. He realized that the other man had a knife and was trying to cut Greene. He fell back to the ground, picked up a bottle, and began swinging the bottle at the other man. The other man dropped the knife, and Greene wrestled with him over the knife. Greene indicated that he was still being hit and kicked at this time. Greene was able to get the knife and began swinging the knife in an effort to get his attackers to back away. Someone yelled that the police were coming, and everyone ran away. Greene ran toward the "Civic Center" and threw the knife to get rid of it because someone had yelled that they had been cut.

¶ 21 After getting rid of the knife, Greene returned to his truck to look for the individuals he went to the club with and saw them in an alley. Greene went to get them so that they could leave, but when they saw the police coming toward them, they ran. Greene ran to a liquor store where he

8

saw the defendant. As soon as he stopped, the police surrounded Greene and the defendant, and both men were arrested.

¶ 22    The defendant attached two affidavits from Bradsfield, which provided as follows. In one affidavit, Bradsfield averred that Labotte had admitted to Bradsfield that Labotte was promised $500 to testify and that she had been threatened with her children being taken away if she did not testify that the defendant stabbed the victim. Bradsfield also averred that she had given Greene's affidavit to postconviction counsel along with Lewis's affidavit, which allegedly provided that Pugh told Lewis that Greene had stabbed Pugh. Bradsfield indicated that postconviction counsel stated he was going to pursue a jury misconduct issue and returned the affidavits to Bradsfield. Bradsfield's other affidavit provided that during trial, statements were made that she and Labotte were best friends for 15 years. Bradsfield averred that she and Labotte had been friends for 8 to 10 years and that their friendship ended several months before the incident. Bradsfield explained why her friendship with Labotte had ended and that she had declined Labotte's attempts to renew their friendship. Bradsfield claimed that she and Labotte had "ill feelings" toward each other that caused Labotte to have "anger and hatred" toward Bradsfield and her family.

¶ 23    Cobb's affidavit provided as follows. After having been being jumped by a group of men on the night of the incident, Cobb made his way to an alley where he met his cousin Shauf. Cobb claimed that Greene then approached them and stated he had "just stabbed a couple of people to get them off him." Cobb, Shauf, and Greene were subsequently arrested. After being released, Cobb contacted Bradsfield to tell her what Greene had said to Cobb. Bradsfield indicated that she would call the defendant's lawyer so that Cobb could testify at trial. Cobb averred that he was present at the trial but not called to testify.

9

¶ 24 Shauf's affidavit indicated that he was in an alley with Cobb when Greene approached and told them he "stabbed a couple of people." Shauf, Cobb, and Greene were then arrested. Shauf averred that he and Cobb contacted Bradsfield, who said she would contact the defendant's lawyer so that Shauf and Cobb could testify at trial. Shauf was present at the trial but was not called to testify.

¶ 25 The trial court denied the defendant's motion for leave to file a successive postconviction petition. The trial court found that affidavits of Bradsfield, Shauf, and Cobb did not meet the standard for newly discovered evidence necessary to make a claim of actual innocence. The trial court further found that Greene's affidavit was vague, noting that Greene did not admit to killing the victim or stabbing any person. The trial court recounted the pathologist's testimony and found that Greene's affidavit did not describe any behavior that would have caused the injuries testified to by the pathologist. The trial court found that while Greene's affidavit could be construed as a confession, it was positively rebutted by the record, specifically the testimony of the pathologist, Labotte, and Williams. The trial court concluded that the evidence presented by the defendant did not place the trial evidence in a different light such that it undermined the court's confidence in the judgment of guilt.

¶ 26 The defendant filed a motion to reconsider. Among other things, the defendant alleged that in denying his motion for leave to file a successive petition, the trial court was holding the defendant to a higher standard than is expected of a *pro se* petitioner. The defendant also alleged that the trial court made mistakes of fact because the defendant did not know about the information in the affidavits until postconviction counsel was hired to prepare the defendant's postconviction petition. The defendant further alleged that Greene's affidavit was not refuted by the record. The defendant argued that Greene's affidavit was consistent with a theory that Greene killed the victim

10

and the discovery of the knife by the "Civic Center." The defendant contended that whether the pathologist's testimony disproved Greene's affidavit was for a jury to decide. The defendant noted that witnesses testified that Greene and the victim were fighting and that the jury had never heard Greene's account of the events; that the State's key witnesses were either related to or "involved" with the victim; and that Williams did not come forward until after he had been arrested for a gun charge and had an attorney. The trial court denied the motion to reconsider. This appeal followed.

¶ 27                                   II. ANALYSIS

¶ 28    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a statutory remedy by which a criminal defendant can assert claims for substantial violations of his or her constitutional rights at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act contemplates the filing of only one postconviction petition. *Edwards*, 2012 IL 111711, ¶ 22. Any claim not presented in an original or amended postconviction petition is waived. 725 ILCS 5/122-3 (West 2020). The bar against successive postconviction proceedings, however, is relaxed where the defendant can establish "cause and prejudice" for failure to assert a postconviction claim in an earlier proceeding, or where a defendant asserts a fundamental miscarriage of justice based on actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42. Here, the defendant contends that the trial court erred in denying his motion for leave to file a successive postconviction petition because the defendant presented a colorable claim of actual innocence.

¶ 29    Before a defendant may bring a successive postconviction petition, the defendant must first obtain leave of the court. *Robinson*, 2020 IL 123849, ¶ 43. The standard for alleging a colorable claim of actual innocence falls between the first-stage pleading requirement for an initial postconviction petition, which only requires that the petition is not frivolous or patently without merit, and the second-stage requirement of a substantial showing of actual innocence. *Robinson*,

11

2020 IL 123849, ¶¶ 43, 58. Leave to file a successive postconviction petition should be granted where the defendant's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence. *People v. Sanders*, 2016 IL 118123, ¶ 24. In determining the legal sufficiency of a postconviction petition, the court is prohibited from making factual and credibility determinations. *Robinson*, 2020 IL 123849, ¶ 45. All well-pleaded allegations in the petition and supporting documentation are taken as true unless positively rebutted by the trial record. *Robinson*, 2020 IL 123849, ¶ 45. In evaluating whether a defendant has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not rebutted by the record, could lead to an acquittal on retrial. *Robinson*, 2020 IL 123849, ¶ 60. We review the trial court's denial of leave to file a successive postconviction petition *de novo*. *People v. Jackson*, 2021 IL 124818, ¶ 27.

¶ 30    In support of his motion for leave to file a successive postconviction petition based on actual innocence, the defendant submitted the affidavits of Greene, Bradsfield, Cobb, and Shauf. To establish a claim of actual innocence, the supporting evidence must be newly discovered, material and not merely cumulative, and of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 31    We begin with Greene's affidavit. Evidence is newly discovered if it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Jackson*, 2021 IL 124818, ¶ 42. The evidence in support of the actual innocence claim must be newly discovered, not necessarily the source. *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48. Therefore, an affidavit from a witness known to the defense prior to trial may be newly discovered. *Fields*, 2020 IL App (1st) 151735, ¶ 48. Such an affidavit constitutes newly discovered evidence

12

if no amount of due diligence by the defense could have compelled the witness to testify at trial to the statements in his or her affidavit. *Fields*, 2020 IL App (1st) 151735, ¶ 48; see, *e.g.*, *Edwards*, 2012 IL 111711, ¶ 38 (the affidavit of a codefendant who exercised his fifth amendment right against self-incrimination at trial qualified as newly discovered evidence, because no amount of diligence could have forced the codefendant to violate that right if he chose not to do so).

¶ 32    In his affidavit, Greene averred that he would have testified at trial to the facts set forth therein, but, on advice of counsel, exercised his right fifth amendment right to avoid self-incrimination. No amount of diligence by the defendant could have forced Greene to testify at trial. Thus, Greene's affidavit meets the standard for newly discovered evidence.

¶ 33    The State argues that the affidavit was not newly discovered because the affidavit was known to the defendant during his initial postconviction proceedings. See *People v. Wideman*, 2016 IL App (1st) 123092, ¶¶ 57-62 (finding that the defendant had not shown the affidavit in question was newly discovered evidence that could not have been asserted in his prior postconviction petitions because the defendant's general averments did not offer a well-pleaded explanation as to why the affidavit could not have been obtained earlier, nor why the defendant did not seek to supplement his pending petition if the defendant received the affidavit while the petition was pending).

¶ 34    Here, the defendant's filings allege that Bradsfield gave Greene's affidavit to postconviction counsel during the initial postconviction proceedings. The problem is, postconviction counsel did not amend the defendant's postconviction petition to include a claim of actual innocence or make any claims regarding Greene's affidavit. According to one of Bradsfield's affidavits, postconviction counsel returned Greene's affidavit to her and indicated counsel was going to pursue a jury misconduct issue. As there was no record of Greene's affidavit

13

in the initial postconviction proceedings, the defendant could not have meaningfully challenged the reasonableness of postconviction counsel's decision on appeal. Likewise, the defendant cannot challenge the reasonableness of postconviction counsel's decision in a successive petition. Under the circumstances of this case, it would be fundamentally unfair to deny the defendant an opportunity to present Greene's affidavit. See *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 130 ("It would be a miscarriage of justice if defendant were denied his day in court where his allegations and supporting documentation, supported by the record and taken as true at this stage, demonstrate that he was unable to put forth the exculpatory evidence of his innocence through no fault of his own.").

¶ 35    Next, we must determine whether the evidence is material and noncumulative. Evidence is material if it is relevant and probative of the defendant's innocence, and noncumulative if it adds to the information the fact finder heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Initially, we find, and the State concedes, that the Greene affidavit was noncumulative. As for materiality, we find that Greene's affidavit was probative of the defendant's innocence. Greene admitted to wielding a knife and swinging it at his attackers in self-defense and would have testified to this at trial, but for the advice of his counsel. Moreover, Greene averred that he "can no longer allow *** [the defendant] to continue to be incarcerated for something he did not do" and claimed that he would have been lying if he testified that the defendant committed the murder in exchange for a deal offered by the State.

¶ 36    Finally, the evidence must be of such a conclusive character that it would probably change the result on retrial. The conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result, and is the most important element of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47. The question for the court

14

is whether the new evidence supporting the successive petition places the evidence at trial in a different light and undermines the court's confidence in the judgment of guilt. *Robinson*, 2020 IL 123849, ¶ 48. The evidence does not have to be entirely dispositive to be likely to change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Robinson*, 2020 IL 124849, ¶ 48.

¶ 37    In assessing the conclusive character element of the defendant's actual innocence claim, the trial court found that the record positively rebutted Greene's affidavit. New evidence is positively rebutted when it is clear from the trial record that no finder of fact could ever accept the veracity of the evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible. *Robinson*, 2020 IL 123849, ¶ 60. At the leave to file stage, however, the applicable inquiry does not focus on whether the new evidence was inconsistent with the trial evidence. *Robinson*, 2020 IL 123849, ¶ 60. Rather, courts must accept as true all well-pleaded allegations and supporting documentation unless the record affirmatively demonstrates that no fact finder could accept their truth. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 38    The trial court noted that Greene's affidavit did not specifically state that he stabbed anyone, but only swung the knife to fend off his attackers, none of whom he identified as the victim. The trial court determined that the pathologist's testimony about the victim's wounds and how the wounds would have been inflicted was odds with Greene's account. The trial court also noted that both Williams and Labotte testified that the defendant stabbed the victim. On the other hand, Greene's affidavit provided that he gained control of a knife during the fight and admitted to swinging the knife at his attackers, which, according to the trial evidence, included the victim. Additionally, Greene averred that the defendant was "incarcerated for something he did not do"

15

and that he did not want to lie by testifying that the defendant committed the murder. Thus, the affidavit in this case is merely inconsistent with the trial evidence, not affirmatively and incontestably demonstrated to be false or impossible. Thus, the trial court erred in finding that the record positively rebutted Greene's affidavit.

¶ 39    Accepting Greene's affidavit as true, as we must, this evidence, when considered along with the trial evidence, raises the probability of an acquittal on retrial. Accordingly, the defendant has shown that he is entitled to file his successive postconviction petition. Because we find Greene's affidavit was sufficient to allow the defendant to file his successive postconviction petition, we need not address the remaining affidavits.

¶ 40                                   III. CONCLUSION

¶ 41    In sum, we vacate the judgment of the trial court and remand this matter for second-stage proceedings at which new counsel will be appointed, the defendant's successive postconviction petition may be amended, and the State can move to dismiss the successive postconviction petition or file an answer. Considering the defendant's allegations regarding postconviction counsel's performance during the initial postconviction proceedings, the trial court should not appoint postconviction counsel, Christian Baril, to represent the defendant in the successive proceedings on remand.

¶ 42    Vacated and remanded.