NOTICE

Decision filed 01/31/22. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2022 IL App (5th) 190317-U

NO. 5-19-0317

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 10-CF-694 |
| | ) | |
| TREVIS S. THOMPSON, | ) | Honorable |
| | ) | Michael A. Fiello, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying the defendant's postconviction petition based on ineffective assistance of appellate counsel claim where the underlying issue was without merit. The trial court's finding that the jury was not prejudiced by extraneous information was not against the manifest weight of the evidence.

¶ 2    Following a jury trial, defendant, Trevis S. Thompson, was convicted of one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)), one count of aggravated battery (720 ILCS 5/12-4(a) (West 2010)), and one count of mob action (720 ILCS 5/25-1(a)(1) (West 2010)). The trial court sentenced the defendant to 50 years in the Illinois Department of Corrections with credit for 217 days served. The defendant directly appealed his

1

conviction and argued that he was not proven guilty beyond a reasonable doubt. We affirmed. See *People v. Thompson*, 2014 IL App (5th) 110290-U.

¶ 3    This appeal involves the defendant's 2015 petition for postconviction relief. The defendant claims that his due process rights to a fair trial were violated when a police officer discarded a box cutter found near the scene of the crime, where the jury's deliberations were tainted by extraneous false allegations about his criminal history never introduced at trial, and where racially biased statements were made by jurors against the defendant. The trial court advanced the petition to the third stage for an evidentiary hearing on the defendant's claims that the jury deliberations were tainted by extraneous information about his criminal history and that some jurors made racially biased statements. The remaining issues, including the allegation that the defendant was denied the right to a fair trial after an officer discarded a box cutter, were denied at the second stage.

¶ 4                                I. BACKGROUND

¶ 5    On November 20, 2010, at approximately 1:15 a.m., more than 50 people were gathered in a parking lot after the opening event for a new nightclub in Carbondale. During that time, numerous fights broke out, including a fight involving the defendant, Patrick Greene, and the victim, Orlando Clark. Clark had been hit over the head with a bottle and was stabbed multiple times. His femoral artery was completely severed, and he bled to death.

¶ 6    Police officers arrived on the scene at approximately 1:20 a.m. and saw "near riot conditions." The officers followed a group of people that refused to stop when commanded, and the group disbursed in different directions. The officers followed the defendant and

2

Greene until they were apprehended that evening. The weapon used to stab the victim was not found.

¶ 7                                     A. Jury Trial

¶ 8     During the jury trial that occurred in March 2011, multiple witnesses testified that they saw the defendant with a weapon as the defendant approached Orlando Clark. The witnesses saw the defendant stab Clark when he was cornered against a brick wall. Multiple witnesses saw the defendant make stabbing gestures at the victim. One of the witnesses, Courtney Williams, testified that they saw Antonio Pugh try to stop the altercation. Courtney Williams saw the defendant use a blade to stab Pugh before stabbing Clark. Courtney Williams described the defendant's weapon as a dark flip out blade made of chrome.

¶ 9     Dee Cross, a crime scene investigator for the Carbondale Police Department, testified about her efforts to collect evidence from the crime scene. Cross indicated she arrived at 2:30 a.m. on November 20, 2010. She, along with several other investigators, took photographs and searched for evidence. Various items of evidence were taken from the scene.

¶ 10    On November 22, 2010, Cross returned to the crime scene to search the surrounding area for the murder weapon. She testified that an evidence technician who had accompanied her found a blue box cutter under an azalea bush near the dumpster in the city hall parking lot, south of the crime scene. Cross photographed the box cutter. She testified that the box cutter had debris on it and was surrounded by leaves. With gloved hands she

3

picked it up, opened it, saw that it was rusty and without any visible signs of blood. The box cutter was not collected as evidence.

¶ 11 That same morning, Cross found a vodka bottle, without visible evidence of blood on it. The bottle was also not collected. Cross testified that she does not write reports on evidence not collected, and she is allowed to make judgment calls when collecting items. Based on her judgment call, she believed that the box cutter and bottle had nothing to do with this case and was not collected as evidence.

¶ 12 The defendant testified on his own behalf during trial. He admitted that he had previously been convicted of aggravated unlawful restraint by accountability and had served a prison sentence. He also testified to the series of events that occurred on November 20, 2010. The defendant stated he had encountered Marshare Adams in the nightclub. During their conversation, Adams took money from the defendant's hands. The defendant fell backwards and twisted his ankle during their interaction. After the defendant injured his ankle, he needed a ride home. Patrick Greene offered to give the defendant a ride. The defendant waited in Greene's truck in the parking lot of the nightclub. While the defendant was sitting in Greene's truck, Adams approached the truck and asked for money. The defendant remembered being pulled out of the truck, but testified he was unaware of who had pulled him from Greene's truck. The defendant further testified that Timothy Oats, Clark's first cousin, began fighting with the defendant soon after he was removed from the truck. The defendant testified that he left the parking lot after fighting with Oats. The defendant explained that there were a lot of people around him when he left the area. He went north until he was apprehended at a nearby liquor store. He denied fighting or stabbing

4

Clark and denied having a knife that evening. The defendant also denied stabbing Pugh and could not explain how Pugh's blood was found on the defendant's shoe and shirt.

¶ 13 The jury reached a verdict and found the defendant guilty of first degree murder, aggravated battery, and mob action. The defendant requested to have the jury members polled. The jurors were asked, individually, if they had heard the verdicts read by the trial court, if that verdict was their verdict during deliberations in the jury room, and whether that verdict was still their verdict while they were being polled. Juror Williams, along with every other member of the jury, affirmed their verdicts.

¶ 14                              B. Posttrial Motions

¶ 15 On April 21, 2011, the defendant filed a posttrial motion and a motion to dismiss. In the posttrial motion, the defendant requested that the trial court vacate the guilty verdict and asserted that the evidence was insufficient to establish his guilt beyond a reasonable doubt. The posttrial motion included the argument that no physical or forensic evidence connected the defendant to the stabbing. The defendant claimed that he was denied his right to due process of law when the police department destroyed a "knife/stabbing instrument" (box cutter) found within 100 yards of the crime scene. The box cutter was not subject to forensic testing. The motion to dismiss specifically addressed the issue of the police department's failure to preserve the box cutter found near the crime scene. The defendant also claimed that the case against him should be dismissed for failing to preserve the box cutter as evidence.

¶ 16 On May 12, 2011, a hearing was set on the defendant's motion to dismiss and the posttrial motion. The defendant requested a continuance on the posttrial motion because a

5

juror had contacted defense counsel and made allegations of juror misconduct. The defendant requested time to investigate the allegations as the juror was unwilling to disclose his identity. The trial court granted the continuance on the posttrial motion and proceeded with the motion to dismiss. The defendant's counsel argued that the crime scene investigator, Cross, had violated section 116-4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-4 (West 2010)), which required her to preserve the box cutter found near the crime scene so that it could be tested. The defendant requested a dismissal of the charges based on the destruction of evidence which resulted in a due process violation. The State argued that section 116-4 applied to the preservation of the chain of custody of evidence after a trial occurred. The State additionally argued that not every item needs to be collected by the police. Cross, according to the State, did not act in bad faith. Her testimony that she identified a box cutter, took photographs, and chose not to collect the box cutter was based on her belief that it was not relevant to this case. After the arguments concluded, the trial court took the matter under advisement.

¶ 17    On May 25, 2011, an order was entered denying the motion to dismiss. The trial court found that the police department followed normal procedures in deciding not to collect the box cutter. The trial court additionally found there was no proof of any motive to destroy potential evidence. Since there was no indication of bad faith on the part of the police in failing to preserve the box cutter, the defendant's due process rights were not violated.

¶ 18    On May 27, 2011, the posttrial motion was heard. The defendant argued that the evidence presented was not sufficient to sustain a conviction. The defendant claimed he

6

was apprehended a block and a half from the crime scene without a weapon. After a search of the area, no weapons were found except the box cutter, which was not collected as evidence. The defendant additionally argued that the trial court should have excluded any evidence regarding the alleged stabbing of Antonio Pugh. The State argued that the victim died from stab wounds and the evidence showed that the only person with a knife was the defendant. Additionally, Pugh's blood was found on the defendant's shirt and there was evidence that Pugh was stabbed. Evidence was also presented that after the stabbing the defendant spoke to individuals that presumably left with the murder weapon. The State again responded to the box cutter argument and asserted that no evidence showed that Cross acted in bad faith by not preserving the box cutter as evidence. The issue of juror misconduct was not raised during the posttrial motion hearing.

¶ 19    The posttrial motion was denied. On June 24, 2011, the defendant was sentenced to 50 years in the Illinois Department of Corrections. The defendant appealed his conviction.

¶ 20                                C. Initial Appeal

¶ 21    On appeal, the defendant argued that he was not proven guilty beyond a reasonable doubt because no physical evidence connected him to the stabbing. The defendant asserted that a considerable amount of blood was at the crime scene and the victim's DNA was not found on the defendant's clothing. He additionally argued that contradictory testimony was presented on whether the defendant had a knife. The defendant's appellate counsel did not raise an issue with Cross's failure to collect the box cutter. On May 7, 2014, this court affirmed the decision of the trial court and held that the defendant was proven guilty beyond a reasonable doubt. See *Thompson*, 2014 IL App (5th) 110290-U.

7

¶ 22                          D. Postconviction

¶ 23    After this court affirmed the trial court's decision, the defendant retained new counsel, Christian Baril, to file a postconviction petition. On March 11, 2015, the trial court granted counsel additional time to file the postconviction petition. On August 10, 2015, counsel filed a petition for postconviction relief. The petition asserted that the defendant's due process rights to a fair trial were violated when Cross discarded a "knife" found at the scene of the crime, when evidence of other crimes was admitted at the trial over the defendant's objection, and when the jury's deliberations were tainted by extraneous information that was outside the scope of the trial. The defendant raised, for the first time, an issue with his right to equal protection under the law where the State used a peremptory challenge, without a racially neutral reason, to exclude an African American prospective juror. The defendant also included claims of ineffective assistance of trial counsel and appellate counsel. Attached to the petition were excerpts from the trial transcript.

¶ 24    On January 8, 2016, the State filed a response to the petition for postconviction relief. The State raised an estoppel argument and asserted that the issues raised in the petition could have been raised on direct appeal. The State argued that the defendant would not be able to establish that the collection of the box cutter would have provided exculpatory evidence as the victim's wounds were consistent with a knife wound and not a box cutter. At least one witness had described the knife used by the defendant. The State also argued that the box cutter was found under the leaves of an azalea bush. The box cutter appeared rusty and had no visible signs of blood on it. Regarding the allegation that the jurors considered information outside of the scope of the trial and racially prejudiced

8

statements, the State asserted that the defendant's allegations were speculative and not verified in the petition.

¶ 25 On March 11, 2016, the defendant filed a motion for extension of time to obtain an affidavit from a juror to support the allegations in the petition. The defendant did not identify the specific juror. On April 26, 2016, the defendant filed a motion to subpoena juror James Williams for either an evidentiary hearing or an evidentiary deposition. Williams had refused to sign an affidavit because he was concerned for his safety and his children's safety if his personal information was disclosed. The State did not object to the issuance of a subpoena but requested that contact information for Williams be disclosed so that he could be interviewed.

¶ 26 On May 4, 2016, the defendant filed an amendment to his petition for postconviction relief. The amendment added information about juror Williams, and included the claim that jury deliberations were tainted, as jurors considered information outside the scope of the trial. On May 6, 2016, the trial court issued a subpoena for an evidence deposition of Williams.

¶ 27 On June 17, 2016, an evidence deposition was taken of juror Williams. He testified that the jury foreman had said that the defendant was convicted twice before, but the convictions were overturned when the "state overturned the judge's behavior" and when "they overturned the prosecutor's work." The foreman had additionally told Williams that in one of the prior cases, the defendant intimidated a high school coach into not testifying and, "this time they are going to get him." Williams had assumed that those convictions would have been discussed during trial, but evidence of the alleged convictions was never

presented. Williams also testified that another juror, described as "a young lady who had been in the army," asked Williams, "how could you not know this? Everybody knows this." Williams explained that the female juror's statement was referring to the defendant's prior trials and convictions. Williams further testified that, after the trial, he contacted defense attorney Mansfield to explain that Williams believed there were problems from *voir dire* to the end of trial. Williams stated, "I voted guilty on [the defendant] and my intention was to come out and tell the judge, yes, I signed the paper but there was some bad things going on there. There were racial comments made during the jurors' deliberation."

¶ 28 On July 26, 2016, the State filed an addendum to its response to the defendant's petition for postconviction relief and attached the evidence deposition of Williams. The State argued that "the extraneous information did not affect [Williams's] decision in a prejudicial way." Williams had also signed the guilty verdict and chose not to speak with the judge.

¶ 29 On August 4, 2016, the defendant filed a reply to the State's responsive pleading as it related to Williams's testimony, with a motion to add the evidence deposition to the amended petition. The defendant asserted that in 2004 he was convicted of aggravated battery with a firearm, aggravated discharge of a firearm, and possession of a controlled substance. That 2004 case involved the shooting of a coach at a high school. The defendant's sentence was overturned on appeal, and he was not convicted. This information about the defendant was not presented at trial. Based upon Williams's testimony, however, it was allegedly discussed by the jurors. The defendant's pleading also generally claimed

10

that Williams stated, "there were racial comments made during the juror's deliberation," without specifying in any detail what comments were actually made.

¶ 30    On October 6, 2016, an order was entered allowing an evidentiary hearing on the defendant's petition for postconviction relief. The order also granted leave to conduct evidentiary depositions of the remaining jurors, granted leave for the amendment to the petition for postconviction relief, and granted the motion to add the evidence deposition of Williams to the amended petition.

¶ 31    On June 21, 2017, the trial court held an evidentiary hearing for jurors to testify regarding their recollections of whether any extraneous and prejudicial statements were made while the jurors were together. Thomas Mansfield, the defendant's trial counsel, along with eight of the jury members, testified.

¶ 32    Thomas Mansfield testified that juror Williams called Mansfield's office in early April of 2011, approximately two weeks after the verdict. Williams was concerned about discussions that had occurred prior to jury deliberations and statements made during jury deliberations. Williams indicated that jury members had discussed prior crimes committed by the defendant. Mansfield had several conversations with Williams. Williams initially did not wish to disclose his identity. After Mansfield advised Williams that his identity would have to be disclosed, Williams quit cooperating. He did not return calls and failed to show for an appointment. Mansfield believed that Williams was concerned for his safety if his information was disclosed because on the night of the verdict, the defendant's mother's house was "set ablaze."

11

¶ 33 Juror Christopher Vaughn also testified. Vaughn testified that he heard a comment that, "this is now [the defendant's] second or third incident in the exact same situation." Vaughn could not remember who made the statement and did not know if the statement was made by a male or female juror. He also could not remember if the statement was heard by all of the jurors. Vaughn recalled that in response to the statement the foreman stated, "we are here for this case and only this case, and we can't talk about other cases." Vaughn did not recall any discussions that occurred regarding prior murder cases by the defendant, and he was not aware of any prior criminal cases that involved the defendant. Vaughn testified that he made his decision based on the evidence presented in this case and the extraneous information did not affect his decision. Additionally, Vaughn did not hear any racially derogatory comments made during deliberations.

¶ 34 Juror Nadim Kassimali testified. He did not remember any discussion regarding prior murder charges against the defendant. Kassimali stated that he remembered his time as a juror "pretty well." He was additionally asked, "do you remember any racially prejudice or derogatory statements being made by any jurors or anyone else during deliberations?" In response, Kassimali stated "absolutely not."

¶ 35 Juror Sarah Bates testified. She had no knowledge of any statement made during deliberations about the defendant's past criminal record. Bates testified that no statement was made that the defendant had been charged with murder twice before and it was not a matter of her not being able to remember; the statement was not made. She did not believe that anything happened during the trial or during deliberations that would have caused

12

concern. Bates was also unaware of any racially prejudiced statements made during deliberations.

¶ 36    Juror Donald Torres testified that his memory about being a juror six years ago was "not good." Torres could not recall whether anyone had made a statement that the defendant was charged with other crimes. When asked whether he remembered if any racially prejudiced statements were made during deliberations, Torres stated, "I did not hear it."

¶ 37    Juror Austin Pulcher testified that he was not told that the defendant had been charged with murder as a result of any prior incidents. He testified that there were no statements made about the defendant's prior criminal history or racially prejudicial statements during trial or during deliberations. When asked about his memory of the trial, Pulcher did not believe he could remember specific information.

¶ 38    Juror Michael Layne testified that he could not recall any statements made about the defendant being charged with crimes that were not brought up during trial. Layne was specifically questioned about an incident involving the defendant and a coach in Carbondale. Layne did not recall any statements made about a coach. Layne testified that he was employed as a coach and a teacher and if a statement was made about a coach, he would have remembered. He also did not recall any racial statements being made during deliberations. Layne stated, "There was a chair *** a chairperson that had the rules in front of them, and we saw those, and I didn't see any inappropriate things to my knowledge."

¶ 39 Juror Michelle Suarez also testified. She did not remember anyone mentioning criminal charges having been brought against the defendant. She also did not recall any racially prejudiced statements or comments made about the defendant.

¶ 40 Williams was the last juror to testify during the June 21, 2017, hearing. Williams testified that after he was selected to be on the jury, the person campaigning to be the foreman, that eventually became the foreman, made a statement about the defendant's criminal history. Williams remembered that before the trial started, the foreman stated, "they've got this guy in prison twice already." The foreman also said, "it's been overturned by the state. The prosecutor is upset about it, but this time they've got him for sure." Williams testified that he could only remember the discussion of an incident that involved a high school coach who did not want to testify. Williams was stunned by the comments made about the defendant not receiving a fair trial on prior charges. Williams believed six or eight jurors heard these statements. Williams also testified to his recollection of racially biased statements made about the defendant during deliberations. Williams stated that, "it was pointed out by another jury member and backed up by another jury member that, 'He was one of them. Why am I arguing for the evidence? He wouldn't do the same for you.' " When asked if any racial slurs were made, Williams stated that he had asked what "them" referred to and received a response that "you know exactly what we're talking about." Williams testified that he ended the conversation by stating "we're not allowed to go there."

¶ 41 Williams also testified that he does not always hear well. Williams had asked for clarification on a witness's testimony that he did not hear during the trial. In response to his inquiry, he was asked why he was defending "one of them." He was told they were not

14

supposed to discuss his question and was surprised that no one would help him understand something he had trouble hearing during the trial.

¶ 42   Williams testified that he had signed the verdict form finding the defendant was guilty. The trial court had polled the jury and Williams did not raise any issue with the guilty verdict. Williams also testified that he had contacted defense counsel, Mansfield, after the trial and did not want his information published in the paper because he was worried about his family's safety. He was still worried about testifying when he testified at the evidentiary hearing.

¶ 43   Juror Peter Pederson was not called as a witness and was out of state during the initial hearing on June 21, 2017. The case was continued to obtain his testimony as he was the person who allegedly made the statements about the defendant's criminal history. On October 4, 2017, Pederson testified via the telephone. Pederson testified that he did not know the defendant in this case prior to the trial. He was not aware of the defendant's prior criminal history and did not know of an incident involving a high school coach. Pederson testified that he did not hear anyone use any racial slurs prior to or during deliberations. He further stated that if that would have happened, "it would have been quashed immediately." He also testified that, every morning, bailiffs would tell the jurors that they should not discuss the case amongst themselves until after the decision was made.

¶ 44   Three members of the jury did not testify during the evidentiary hearing. One juror had passed away and the other two members could not be found. The trial court allowed the defendant additional time to find the witnesses, but they were not located.

¶ 45   On October 6, 2017, the trial court issued an order that the court had heard testimony from the jurors in this case. The trial court directed the parties to prepare written arguments. Transcripts for the hearings that took place on June 21, 2017, and October 4, 2017, were also ordered to be prepared.

¶ 46   On November 9, 2017, the State filed a second addendum in response to the defendant's petition for postconviction relief regarding the jury misconduct issue. The State argued that it was "the defendant's burden to show that external information was provided to the jury and that this information resulted in prejudice to the defendant." Based on the testimony of nine jurors, the State argued that the defendant did not establish that Pederson made the extraneous statements as alleged by Williams, and there was insufficient evidence to show any probability of prejudice.

¶ 47   On November 29, 2017, the defendant filed an addendum to his petition for postconviction relief regarding the extraneous information and juror misconduct. The defendant argued that he had demonstrated that external information had reached the jurors about the defendant's "alleged and incorrect prior murder convictions." That information, as argued by the defendant, was "extremely prejudicial." The defendant also argued that racial comments "create such a probability that prejudice will result that the trial is deemed inherently lacking in due process."

¶ 48   On April 27, 2018, the defendant filed a second addendum to his petition for postconviction relief regarding ineffective assistance of counsel. The defendant argued that, during Williams's deposition, he testified that he called Mansfield's office and informed Mansfield that there were issues with the jury and racial comments had been

made during deliberations. Williams further testified that Mansfield brought Williams's concerns to the judge's attention. Williams "chickened out" because his personal information would have been published in the paper. When Mansfield testified, he stated that Williams contacted him because he was concerned about statements that were made during deliberations. Mansfield had several conversations with Williams until Williams quit cooperating. Mansfield did not think the issue would go anywhere without Williams's cooperation. The defendant argued that Mansfield was ineffective in representing the defendant because Mansfield failed to file a motion for a new trial that included the information discovered through his conversations with Williams.

¶ 49    On May 4, 2018, the defendant filed additional exhibits to include with his petition for postconviction relief. The exhibits included two trial photos of the box cutter found by Cross and a photo of the same brand of box cutter purchased by defendant's counsel.

¶ 50    On November 29, 2018, the trial court denied the defendant's postconviction petition. The trial court found that the decision not to argue the box cutter issue on appeal did not amount to ineffective assistance of counsel or a deprivation of constitutional rights. The trial court decided that the issue of improper evidence admitted at trial regarding the stabbing of Pugh was raised on appeal and could not be relitigated in a postconviction proceeding. The alleged *Batson* violation that occurred during jury selection was also denied by the trial court. *Batson v. Kentucky*, 476 U.S. 79 (1986). Additionally, the trial court found that there was no basis for an ineffective assistance of counsel claim. The trial court stated that "to claim ineffectiveness of counsel when the juror refused to be identified is absurd." The trial court also denied the postconviction petition allegation that jury

deliberations were tainted by information not presented at trial and by racially prejudiced statements made during deliberations. The trial court considered the testimony of Williams and the eight other jurors that testified regarding statements made during deliberations. When determining whether the defendant's due process rights were violated by statements made during deliberations by the jury, the trial court considered the test set forth in *People v. Holmes*, 69 Ill. 2d 507 (1978). The trial court found that the allegations made by Williams met the first prong set forth in *Holmes*, of "whether improper extraneous influences prejudiced the jury." The trial court then stated:

> "Although there was some collaboration [*sic*] of the allegations of James Williams by Charles Vaughn, none of the other jurors confirmed the allegations. Furthermore, inconsistencies in the statements of James Williams create doubt as to the specifics of the allegations. Reviewing the testimony of the jurors, it appears as if someone said something that was shut down during the deliberation process and neither prejudiced nor influenced the jury."

¶ 51    The defendant filed a motion to reconsider on December 27, 2018. He argued that an evidentiary hearing should have been allowed for all seven issues raised in his postconviction petition. The defendant claimed that the trial court was mistaken when it found that the defendant's trial counsel was not ineffective based on the allegation that Williams refused to be identified. The defendant requested that the trial court reconsider the finding that there was no prejudice or influence when jurors heard false information about the defendant's alleged prior murder convictions. On May 3, 2019, the State filed a response to the motion to reconsider and argued that the defendant failed to provide new information that was not available at the time of the trial court's decision.

18

¶ 52   On June 27, 2019, the trial court heard arguments on the defendant's motion to reconsider the denial of his postconviction petition. The judge who had ruled on the petition had retired and a new judge was assigned to the motion. Postconviction counsel argued that the trial court should reconsider all seven issues raised in the postconviction petition but focused his argument on the issue of extraneous information that was known to the jury during the defendant's trial. Postconviction counsel argued that the jurors had discussed that the defendant had been twice convicted of murder and those convictions were vacated due to technicalities. Counsel also argued that the trial court had mistakenly believed that defense attorney Mansfield was unaware of Williams's identity when, in fact, Williams had refused to disclose his identity to the public. Therefore, trial counsel was ineffective when he had failed to subpoena Williams to testify at the motion for a new trial where Williams's identity was known to Mansfield.

¶ 53   Counsel further argued that the trial court misapplied the law when it found that, "the jury was neither prejudiced nor influenced by improper communication or outside influence." Rather, as argued by postconviction counsel, the trial court should have considered "whether the conduct involved such a probability that prejudice will result that it's deemed to be inherently lacking in due process."

¶ 54   Additionally, postconviction counsel argued during the motion to reconsider that the jurors should not have testified to their thought processes during jury deliberations. The trial court questioned counsel as to whether the court could consider the questions posed to the jurors during the evidentiary hearing, where no objections were made during their testimony. Postconviction counsel conceded that the trial court could consider all of the

19

testimony, as there were no objections. Postconviction counsel maintained that the jury discussion about the defendant's alleged criminal history of having been convicted of murder on two prior occasions was prejudicial. Counsel argued that Vaughn corroborated Williams's testimony, and prejudicial statements were made to the jury.

¶ 55    The State argued that in a motion to reconsider, only new information that was not available at the time of the original order was allowed and all of the information argued by postconviction counsel was already presented in prior motions. When considering the testimony of the jurors, the trial court asked the State, "if we were to assume that Williams's and Vaughn's testimony is true, those things happened, do you think that is sufficient prejudice to order a new trial?" The State responded, "assuming that their statements are correct; yes, your honor." The trial court further asked if the order dismissing the postconviction petition included a specific finding that those things happened. The State argued that a statement was made, but the statement did not rise to the level of denying the defendant's due process because what was said was shut down during the deliberations. The trial court questioned the language used in the prior judge's finding and stated, "well, that's kind of troubling me, because if he says these things were said, okay. I mean, you've already told me if they were said, then that's prejudicial." The State argued that the prior judge's decision found that he did not find every statement by Williams to be credible because his statements were not confirmed. The State did not believe that there was a finding of what was said or not said.

¶ 56    The trial court additionally inquired if the record contained any other information that showed that the jury received prejudicial information. Postconviction counsel argued

20

that if prejudicial information "that goes to the heart of the case" reached the jury, then the burden shifts to the State to show that it was not prejudicial. Postconviction counsel argued that since the defendant was convicted, the information was prejudicial. The State responded that the jurors testified that the information did not influence their decision. After argument, the trial court took the matter under advisement.

¶ 57    On July 10, 2019, the trial court denied the defendant's motion to reconsider. In the written decision, the trial court recognized that an evidentiary hearing was held on one of the seven issues asserted in the postconviction petition. The trial court denied the defendant's request for an evidentiary hearing on the remaining six issues. For those six issues, the trial court found that "neither Defendant's petition nor his argument regarding this issue brought to the Court's attention any newly discovered evidence not available at the time of the trial, changes in the law, or errors in the Court's application of existing law." The trial court then rejected the defendant's argument that the denial of the ineffective assistance of counsel claim was a mistake in fact. The court found that the testimony by the juror that he refused to be identified publicly was consistent with the ruling. The trial court next discussed the issue of extraneous information being presented to the jury. The order stated:

> "This Court reads Judge Schwartz's decision as making a finding that extraneous information was received by the jury, but that the incident was harmless. If the only evidence was that extraneous information was received by the jury, the type of extraneous information alleged here would have been prejudicial to Defendant. In this case, however, 8 jurors were questioned about the incident. 6 testified that they never heard the extraneous information. Two testified that they did. One testified, without objection by either party, and that the information had no effect on his decision (Transcript of 6/21/17 hearing at p. 13). The other testified that although he heard this information, thought it was improper, and intended to tell the trial

21

judge about it, he voted to convict Defendant, confirmed his vote when polled by the court, and never mentioned his concerns until he called Defendant's defense attorney about 2 weeks after the trial concluded (Tr. pp 31-46). Based upon this evidence, this Court cannot find that Judge Schwartz's finding that the jury 'was neither prejudiced nor influenced by improper communication or outside influences' resulted from a misapplication of the law."[1]

This appeal followed.

¶ 58                          II. ANALYSIS

¶ 59    The trial court denied seven of the claims alleged in the defendant's petition for postconviction relief. On appeal, the defendant only raises issues with the denial of two of these claims. The defendant argues that he made a substantial showing that his due process rights were violated when a police officer discarded a box cutter found near the crime scene. The defendant also argues that his due process right to a fair trial was denied because the jury's deliberations included information about the defendant's criminal history and racially biased statements were made by jurors against the defendant.

¶ 60    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a three-step process to resolve a criminal defendant's conviction or sentence that resulted from a violation of rights protected under the state or federal constitution. *People v. York*, 2016 IL App (5th) 130579, ¶ 15. "At the first stage of postconviction proceedings, the court reviews the petition to determine whether it is frivolous and patently without merit." *York*, 2016 IL App (5th) 130579, ¶ 15. The defendant must make a "substantial showing of a constitutional violation" at the second stage. (Internal quotation marks omitted.) *York*, 2016

---

[1]The order included a footnote that the evidence deposition of Williams was not offered or admitted into evidence and that the trial court did not consider the testimony provided during the deposition.

IL App (5th) 130579, ¶ 16. Then, if the petition advances to the third stage, the court will hold an evidentiary hearing on the defendant's claims. *People v. Wallace*, 2018 IL App (5th) 140385, ¶ 27. The trial court will either grant or deny the relief requested in the petition after the evidentiary hearing. *People v. Dredge*, 148 Ill. App. 3d 911, 913 (1986).

¶ 61                    A. Preservation of Potentially Useful Evidence

¶ 62    The defendant claimed his due process rights were violated when the crime scene investigator discarded potentially useful evidence found near the crime scene. This issue was dismissed at the second stage of the proceedings, without an evidentiary hearing. A second stage dismissal is reviewed *de novo*. *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 64.

¶ 63    The defendant did not raise this issue in his initial appeal even though the trial court had denied two motions asserting this same argument. Cross had testified at trial about her decision to discard the box cutter found near the scene of the crime. In his motion to dismiss, and again in his posttrial motion, the defendant claimed that his due process rights had been violated by Cross's decision not to preserve the box cutter. The trial court denied both motions. Since the issue was not raised in the defendant's direct appeal it was, conceivably, forfeited.[2]

¶ 64    The defendant, however, raised the box cutter issue through a claim of ineffective assistance of appellate counsel. Where forfeiture is based on ineffective assistance of

---

[2]In a proceeding on a petition for postconviction relief, issues that were not raised on direct appeal but could have been raised are forfeited. *People v. English*, 2013 IL 112890, ¶ 22.

appellate counsel, the doctrine of forfeiture is relaxed in a postconviction proceeding where "fundamental fairness so requires." *English*, 2013 IL 112890, ¶ 22.

¶ 65    The two-pronged ineffective assistance of counsel test from *Strickland v. Washington*, 466 U.S. 668 (1984), applies to appellate counsel. *People v. Rogers*, 197 Ill. 2d 216, 223 (2001). "A defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating such failure was objectively unreasonable and that counsel's decision prejudiced defendant." *Rogers*, 197 Ill. 2d at 223. Not every conceived issue on appeal is required to be argued by appellate counsel. *People v. Williams*, 209 Ill. 2d 227, 243 (2004). If the underlying issue is without merit, then the defendant cannot satisfy the prejudice prong of the ineffective assistance test. *Rogers*, 197 Ill. 2d at 223.

¶ 66    The underlying issue here is whether the defendant's due process rights were violated when the box cutter found near the crime scene was not preserved as evidence. Due process rights were violated if the defendant can demonstrate that the law enforcement's failure to preserve potentially useful evidence was in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

¶ 67    Additional factors to consider in determining bad faith are whether the investigator acted in accordance with normal practices, whether the evidence was significant in defendant's defense, and whether comparable evidence could not be obtained by other reasonable and available means. *People v. Nunn*, 2014 IL App (3d) 120614, ¶ 17. The term "bad faith" implies a furtive design, dishonesty, or ill will, and "bad faith" is distinguished from negligence or bad judgment. *People v. Danielly*, 274 Ill. App. 3d 358, 364 (1995).

24

¶ 68    The defendant argues that Cross discarded the box cutter because it did not fit the theory that the defendant was the perpetrator. He claims that the box cutter was located to the south of the crime scene, and not to the north of the crime scene, where the defendant was apprehended. The defendant concluded that because the investigator could not have linked the defendant to the location of where the box cutter was found, the investigator discarded the potential evidence in bad faith. No evidence of Cross's motive was presented.

¶ 69    Cross testified at trial regarding her process of collecting evidence. After the box cutter was found by a crime scene technician under a bush, Cross took photographs of the box cutter. Then, with gloved hands, she picked up the box cutter and examined it. Cross saw no visible signs of blood and the box cutter appeared rusty. Upon further examination, Cross did not believe that the box cutter was recently discarded or relevant to the murder. We agree with the trial court that the evidence presented did not show bad faith or ill will by Cross.

¶ 70    In addition to the foregoing, the trial court must also consider the importance of the lost evidence compared to the evidence presented at trial. *Nunn*, 2014 IL App (3d) 120614, ¶ 17. This court had already determined that the evidence presented at trial was more than sufficient to sustain the defendant's convictions. The incident occurred in front of multiple witnesses. Multiple witnesses saw the defendant with a weapon when he approached the victim. They saw the defendant make stabbing gestures at the victim while holding the weapon. Evidence was presented that the defendant stabbed another individual (Pugh) prior to stabbing the victim, Clark. At least one witness was able to describe the knife.

25

¶ 71 The defendant did not make a substantial showing that his due process rights were violated. The trial court did not err in dismissing the defendant's postconviction petition based on his claim that appellate counsel was ineffective for deciding not to raise this issue on appeal when the underlying claim was without merit. We affirm the trial court's dismissal on this issue.

¶ 72                    B. Extraneous Prejudicial Information

¶ 73 The defendant additionally claims that the jury was influenced by extraneous prejudicial information during deliberations. This second issue raised on appeal by the defendant advanced to a third stage evidentiary hearing. After an evidentiary hearing where fact-finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous. *English*, 2013 IL 112890, ¶ 23. Manifest error is "clearly evident, plain, and indisputable" (internal quotation marks omitted), and a "decision is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 74 Extraneous information that reaches the jury is presumed to be prejudicial if the defendant can show that the information directly related to something at issue in the case and that it may have influenced the verdict. *People v. Collins*, 351 Ill. App. 3d 175, 179 (2004). If the defendant was prejudiced as a result of improper communication or outside influence on the jury, the verdict will be set aside. *People v. Hobley*, 182 Ill. 2d 404, 458 (1998).

¶ 75 The trial court held a third stage evidentiary hearing and allowed testimony by the jurors to determine whether they were influenced by extraneous prejudicial information.

26

As a general rule, a jury verdict may not be impeached by a juror's testimony. *Holmes*, 69 Ill. 2d at 511. It is impermissible to impeach a verdict based on the motives, methods, or processes the jury used to reach its conclusion. *Holmes*, 69 Ill. 2d at 511. A juror, however, is permitted to testify to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." (Internal quotation marks omitted.) *Holmes*, 69 Ill. 2d at 516.

¶ 76 The defendant not only alleges that extraneous information about the defendant's criminal history improperly influenced the jury, but he also alleges racially prejudiced statements were received by the jury. "[W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Pena-Rodriguez v. Colorado*, 580 U.S. ___, ___, 137 S. Ct. 855, 869 (2017). "For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Pena-Rodriguez*, 580 U.S. at ___, 137 S. Ct. at 869.

¶ 77 Nine jurors testified about their recollection of statements made regarding the defendant's criminal history and whether racially biased statements were made during deliberations. Out of the nine jurors that testified, seven did not recall or did not believe any statements were made about the defendant's criminal history or that any racially biased statements were made. Notably, the jurors' testimony is limited and the testimony on the

27

effect of influences on the mental process of the jurors is inadmissible. *Hobley*, 182 Ill. 2d at 458. However, "absent an objection, otherwise inadmissible evidence is to be given its full probative effect." *Collins*, 351 Ill. App. 3d at 178. Since no objections were raised when the jurors testified that they made their decision based on the evidence presented and were not influenced by extraneous information, their testimony was given its full probative effect.

¶ 78     One juror, Vaughn, had a vague recollection of something being said about the defendant having two or three prior convictions. Vaughn testified that the foreman immediately stopped the conversation and said, "we are here for this case and only this case, and we can't talk about other cases." Vaughn did not recall any discussions about prior murder cases involving the defendant, and he was not aware of the defendant's criminal history. He further testified, without objection, that he made his decision based on the evidence presented and he was not affected by any extraneous information.

¶ 79     Williams was the juror that initially made the allegations of extraneous information influencing the jury. Both Pederson and Vaughn contradicted Williams's testimony that the foreman had made statements about the defendant's criminal history. Williams did not raise any issues regarding the jury's deliberations when the jurors were asked whether they had signed the guilty verdict form and were polled by the trial court. Williams had contacted defense counsel to make the allegations only after the trial had concluded and initially refused to cooperate or disclose his identity. Williams was the only juror that testified that he believed a racially prejudicial statement was made. Williams testified that a jury member stated, "He was one of them. Why [are you] arguing for the evidence? He

wouldn't do the same for you." When asked if any racial slurs were used, Williams said he had asked for clarification on what "them" referred to and was told that he knew what they were talking about. During Williams's testimony about being confronted for defending one of "them," Williams also testified that he does not always hear well.

¶ 80    Reversal is not required for every instance where unauthorized information reaches the jury. *People v. Palmer*, 125 Ill. App. 3d 703, 711 (1984). The State has the burden to demonstrate that extraneous information is harmless. *Collins*, 351 Ill. App. 3d at 179.

¶ 81    The trial court determined the extent of the extraneous information alleged by the defendant. After hearing testimony from nine jurors, the trial court could only conclude that "someone said something." There were no findings of any specific statements made that would have prejudiced the defendant. The trial court found Williams's testimony to be inconsistent and to have "create[d] doubt as to the specifics of the allegations."

¶ 82    The trial court serves as the fact finder, and, therefore, it is the trial court's function to determine witness credibility and decide the weight to be given testimony and evidence. *People v. Carter*, 2013 IL App (2d) 110703, ¶ 74. The trial court's finding that the jury was not prejudiced by extraneous information after considering the credibility of the jurors' testimony during an evidentiary hearing was not against the manifest weight of the evidence. Therefore, we affirm the ruling by the trial court.

¶ 83                              III. CONCLUSION

¶ 84    For the foregoing reasons, we affirm the judgment of the circuit court of Jackson County.

¶ 85    Affirmed.