NOTICE
Decision filed 03/25/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250044-U

NO. 5-25-0044

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 10-CF-694 |
| | ) | |
| TREVIS THOMPSON, | ) | Honorable |
| | ) | Michael A. Fiello, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Vaughan and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The trial court's order granting the defendant's successive amended petition for postconviction relief following a third-stage evidentiary hearing was not manifestly erroneous. Where the trial court reasonably determined that the newly presented evidence was of such conclusive character that it would probably change the result on retrial, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On November 23, 2010, the defendant, Trevis Thompson, was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 2008)), aggravated battery (*id.* § 12-4(a)), and mob action (*id.* § 25-1(a)(1)) arising from the death of Orlando Clark (Orlando) following a large fight outside a nightclub in Carbondale, Illinois, in the early morning hours of November 20, 2010. The charging instrument alleged that the defendant and his cousin, Patrick Greene (Greene), acted together and were legally accountable for each other's actions. The defendant and Greene were co-defendants

1

at the same jury trial. The jury found the defendant guilty on all counts. Greene was found guilty of mob action and aggravated battery but was acquitted of first degree murder. The defendant was sentenced to a 50-year prison term, followed by a 3-year term of mandatory supervised release. The defendant's convictions and sentence were later affirmed on direct appeal. See *People v. Thompson*, 2014 IL App (5th) 110290-U. Because the facts at trial are fully set forth in that decision, we recite only those facts necessary to our disposition in this appeal.

¶ 4       The evidence at the defendant's jury trial established that the altercation began in the early morning hours of November 20, 2010, when the defendant exited a nightclub and became involved in a dispute with Marshare Adams (Adams) near Greene's vehicle. Adams testified that when she exited the nightclub, the defendant grabbed $5 from her hand. Witnesses testified that Adams confronted the defendant about the money he had taken from her and that Greene emerged from his vehicle, yelling at Adams to get away from his truck. The dispute escalated when multiple fights broke out in the parking lot involving numerous individuals.

¶ 5       Several eyewitnesses testified about the multiple fights, involving dozens of people. Jeremy Clark (Jeremy) testified that he observed Greene and the defendant arguing with Adams near Greene's vehicle before Orlando approached Greene and began fighting with him. Jeremy further testified that after he broke away from his own fight, he saw Greene and the defendant striking Orlando while Orlando was backed up against a wall. Courtney Williams (Williams) testified that the defendant exited Greene's vehicle holding what he described as a chrome flip-blade knife and moved toward the confrontation involving Greene and Orlando. When another individual, Antonio Pugh (Pugh) tried to intervene, the defendant stabbed Pugh in the upper torso. Williams testified that during the commotion, he saw the defendant following Greene and Orlando, making stabbing motions toward Orlando until they reached a nearby wall. Once at the wall, the

2

defendant swung the blade again, and Orlando collapsed to the ground. Greene then picked up two Remy Martin liquor bottles and struck Orlando in the head and face repeatedly. The defendant and Greene then "crept off" down a nearby alley.

¶ 6 Another eyewitness, Regina Labotte (Labotte), Orlando's girlfriend, testified that she initially observed Greene and Adams arguing in the parking lot. Labotte went back in the club briefly, and when she came back outside, the argument had escalated significantly, and a crowd had gathered. The confrontation moved toward a nearby wall, and Orlando became cornered between Greene and the defendant. Labotte stated that she saw the defendant stab Clark before Greene struck Clark repeatedly with liquor bottles.

¶ 7 Paramedics arrived at the scene and discovered a large wound in Orlando's left thigh, with blood spurting from the wound whenever chest compressions were administered. A paramedic testified that Orlando was unresponsive upon their arrival and appeared to have lost most of his blood. The paramedic said the wound appeared to be from a knife thrust that had been twisted or turned while embedded in Orlando's thigh. Despite resuscitation efforts, paramedics were unable to establish any signs of life, and Orlando was pronounced deceased at the scene.

¶ 8 The pathologist who examined Orlando's body testified that there were seven short force injuries to his body, caused by a knife or knife-like instrument. The pathologist concluded that Orlando died of exsanguination, or blood loss, due to the stab wound to his left thigh, while the other smaller wounds would not have been fatal. The fatal wound measured approximately 3.5 inches long and 2 inches wide, and Orlando's femoral artery had been completely severed. The pathologist explained that the injury was not simply caused by a direct stab but also involved a cutting action, and the arterial injury would typically cause forceful bleeding, with potential spurting of blood from the wound.

¶ 9    When police began looking for witnesses, they found a group of men, including Greene, in an alley. As officers approached, the men walked away, even when ordered to stop. When they reached the end of the alley, the men ran and fled in different directions. During the pursuit, officers came upon Greene and the defendant running, and they were ultimately apprehended. Despite a search along the defendant and Greene's path, no weapon was recovered. Forensic testing showed that Orlando's blood was not found on any of the defendant's clothing, but Pugh's DNA was identified in bloodstains on the defendant's shoes and shirt. Orlando's DNA was detected in bloodstains on Greene's jeans, the inside of his sweatshirt, and on two Remy Martin liquor bottles recovered from the scene.

¶ 10    The defendant testified that he arrived at the club independently from Greene, although at some point during the night, they ran into each other and drove to a liquor store together. After returning to the club, the defendant encountered Adams, with whom he got into a dispute over money. The defendant testified that he and Adams started "playing around" and "wrestling," causing him to fall and injure his ankle. The defendant asked Greene for a ride home because of his injured ankle. Greene told him that he would be outside shortly, so the defendant exited the club and got into the front passenger side of Greene's SUV. Adams followed the defendant to Greene's vehicle, continuing to argue with him for several minutes. After Adams left, the defendant testified that someone opened the passenger door and dragged him out of the vehicle, but he did not see who it was. The defendant said that he began fighting with Timothy Oats, and Oats slammed him to ground. He said that he did not see Greene anywhere around at this point.

¶ 11    The defendant said he got up and made his way east through the alley near the club. He testified that he walked alone toward the train tracks on his way home and was eventually apprehended by police in the parking lot of a liquor store. He denied that he had run from the

4

scene, stating that he was unable to do so because of his ankle injury. The defendant said the officers never told him to stop, and he and Greene never crossed paths until they were both arrested in the liquor store parking lot. The defendant denied stabbing either Orlando or Pugh that night and could not explain how Pugh's blood got on his clothing and shoes. Greene chose not to testify on his own behalf.

¶ 12    On August 10, 2015, the defendant filed his first petition for postconviction relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)). This petition did not include a claim of actual innocence. On November 29, 2018, following a third-stage evidentiary hearing on several of the defendant's claims, the trial court denied the petition, and that ruling was affirmed on appeal. See *People v. Thompson*, 2022 IL App (5th) 190317-U.

¶ 13    On June 9, 2020, the defendant filed a motion for leave to file a successive postconviction petition, in which he claimed, *inter alia*, actual innocence. In support of that claim, he attached several affidavits, including one from the co-defendant, Greene. The defendant contended that the affidavits cast doubt on Labotte and Williams's testimony by offering a "firsthand account" of what happened between Greene and Orlando.

¶ 14    In his affidavit, dated August 13, 2015, Greene stated that on the night of Orlando's murder, he was standing by his vehicle in the club's parking lot when "a group of men approached [him] and began arguing at [him]." One of the men, whom Greene did not identify, punched him in the face, and a physical altercation ensued. Greene stated that he was attacked by multiple individuals and felt something "stick" him. Greene said he gained control of a knife from one of the men and swung it to defend himself, before fleeing and discarding the weapon near the Carbondale Civic Center. Green then returned to his vehicle "to look for the people who had come to the club with [him]; [He] located some of them in the alley near the front of the club." When police arrived,

5

everyone scattered and ran. Greene ran to the liquor store, where he and the defendant were apprehended. Greene stated in the affidavit that his attorney advised him not to testify during the trial. Greene said he was coming forward with this information now because he could "no longer allow *** [the defendant] to continue to be incarcerated for something he did not do."

¶ 15    Additional affidavits were submitted from two individuals who claimed that Greene admitted shortly after the incident that he had stabbed several people during the altercation. Neither of these witnesses were called to testify at trial. Another affidavit cast doubt on Labotte's credibility and asserted that all of these affidavits were provided to the defendant's first postconviction counsel, but that counsel elected not to pursue a claim of actual innocence.

¶ 16    On July 14, 2020, the trial court denied leave to file the successive petition. On appeal, this court reversed that decision, holding that Greene's affidavit was "new, material, and non-cumulative" and "[a]ccepting Greene's affidavit as true, as we must, this evidence, when considered along with the trial evidence, raises the probability of an acquittal on retrial." See *People v. Thompson*, 2023 IL App (5th) 200261-U. On remand, the case proceeded to a third-stage evidentiary hearing on July 22, 2024, and September 1, 2024.

¶ 17    At the evidentiary hearing, the trial court heard testimony from multiple witnesses. Greene testified to his recollection of the events of November 23, 2010, which aligned with the information in his affidavit. During cross-examination, the prosecutor asked Greene multiple times if he understood the concept of double jeopardy, where Greene asked for an explanation. The prosecutor explained that a confession after an acquittal meant Greene could not be prosecuted again, after which Greene asked again for the meaning of double jeopardy. Desmine Schauf (Schauf) testified that he saw Greene on the night of the murder, and Greene told him he had stabbed a couple people, but did not say who.

6

¶ 18    The defendant testified that he did not know during the trial that Greene was the person who stabbed Orlando, nor was he aware of Greene's role at the time of his 2015 postconviction petition. The court reviewed the entire trial record and the newly submitted evidence. In evaluating the evidence, the trial court recognized that the new testimony directly contradicted the State's eyewitness accounts that had placed the knife in the defendant's hands during the fatal confrontation. The court further noted that the State's case at trial relied heavily on the testimony of two eyewitnesses who claimed to have seen the defendant stab Orlando.

¶ 19    After considering all of the evidence—both old and new—the trial court concluded that the newly presented testimony undermined the reliability of the original verdict. The court found that the new evidence "places the trial evidence in a different light and undermines the Court's confidence in the judgment of guilt." The court further determined that the testimony of Greene and other witnesses was sufficiently conclusive to create a probability that a new jury would reach a different result if the evidence were presented at a retrial.

¶ 20    On January 21, 2025, the trial court granted the defendant's amended successive petition for postconviction relief. The State filed a timely notice of appeal.

¶ 21                                II. ANALYSIS

¶ 22    On appeal, the State contends that the trial court erred in granting the defendant's amended successive petition for postconviction relief, specifically arguing that the newly presented testimony—particularly the testimony of co-defendant Greene—was unreliable and insufficiently conclusive to warrant relief. According to the State, the trial court improperly discounted the testimony of the State's eyewitnesses from the original trial and placed undue weight on the defendant's newly presented evidence.

7

¶ 23　Postconviction proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) provide a mechanism through which a defendant may challenge his conviction based on a substantial violation of his constitutional rights. See *People v. Sanders*, 2016 IL 118123, ¶ 21. A postconviction proceeding may advance through three stages of review. At the third stage—after an evidentiary hearing—the trial court serves as the finder of fact and determines the credibility of witnesses and the weight to be given to their testimony. *Id.*

¶ 24　When a postconviction petition proceeds to a third-stage evidentiary hearing, the reviewing court will disturb the trial court's ruling only if it is manifestly erroneous. *People v. Coleman*, 2013 IL 113307, ¶ 98. Manifest error is error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Id.* "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.* "Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial." *Id.* ¶ 97.

¶ 25　A defendant asserting a freestanding claim of actual innocence must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96. Evidence is considered newly discovered when it has been discovered since trial and could not have been discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. "Noncumulative evidence adds to the information that the fact finder heard at trial." *Id.* "Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* The conclusive character of the new evidence is the most important element of an actual innocence claim. *People v. Washington*, 171 Ill. 2d 475, 489 (1996).

¶ 26     In determining whether newly discovered evidence is sufficiently conclusive to warrant relief, the trial court must consider whether the evidence "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48; *Coleman*, 2013 IL 113307, ¶ 97. Importantly, the new evidence need not be entirely dispositive of the defendant's innocence. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id*.

¶ 27     Here, the trial court expressly applied these governing principles in its 13-page written order. After setting forth the procedural history of the case, the court recounted, in detail, each witness's testimony at the evidentiary hearing. The court determined that the evidence presented by the defendant—including Greene's testimony and the testimony of additional witnesses—was newly discovered, material, and not cumulative. The only remaining question before the court was whether that evidence was "of such conclusive character that it would probably change the result on retrial." The trial court concluded that it did.

¶ 28     The court explained that Greene's testimony was not merely cumulative of evidence already presented at trial but instead offered a direct explanation of the fatal stabbing that had not previously been available to the jury. According to Greene's detailed affidavit and his corroborating in-court testimony, he obtained control of a knife when Orlando dropped it and swung that knife at multiple attackers in an effort to defend himself before fleeing the scene. Greene admitted that the knife now in his hand, struck Orlando and Pugh during the fight. In addition to Greene's testimony, the trial court considered testimony from other witnesses who stated that Greene admitted shortly after the incident that he had stabbed individuals during the fight.

9

¶ 29 After considering all of the evidence, including the eyewitness trial testimony, the trial court acknowledged in its written order that "eyewitness testimony is not always accurate," citing our Supreme court in *People v. Lerma*, 2016 IL 118496. The trial court pointed out that the court in *Lerma* said that "advances in DNA testing have confirmed that 'eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined.' " *Id.*, quoting *State v. Dubose*, 285 Wis. 2d 143 (2005). The trial court stated:

> "This case does not involve the question before the Supreme Court in *Lerma*, which was whether the trial court was wrong for denying the defendant the opportunity to present expert testimony on the issue of reliability of eyewitness testimony, but the reasoning stated for allowing that testimony is equally relevant here. While some of the evidence heard at the third stage-hearing can be said to cast doubt on Greene's credibility, there was also evidence that casts doubt on Labotte's credibility. The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistences and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact. *People v. Milka*, 211 Ill. 2d 150 (2004). The evidence supporting Defendant's post-conviction petition places the trial evidence in a different light and undermines the Court's confidence in the judgment of guilt."

¶ 30 The record establishes that the trial court conducted precisely the type of careful evaluation required when reviewing postconviction petitions based upon actual innocence. The court "reviewed the entire transcript of the defendant's original trial," presided over the evidentiary hearing, heard the testimony of the witnesses, and had the opportunity to observe their demeanor and assess their credibility firsthand. The court also considered the State's arguments concerning

10

inconsistencies in Greene's account and the circumstances under which his testimony emerged. After weighing those considerations, the court concluded that Greene's testimony was sufficiently credible and significant to undermine confidence in the original verdict. The court further determined that, when considered together with the other newly presented testimony, Greene's account created a probability that a new jury could reach a different result.

¶ 31 The trial court also recognized that the State would remain free to challenge Greene's credibility at a retrial and to argue that the eyewitness testimony presented at the original trial should be credited instead. However, the possibility that the new evidence might be contested does not defeat a claim of actual innocence. As the supreme court has explained, newly discovered evidence may still satisfy the conclusiveness requirement even if it is subject to impeachment or dispute. *Coleman*, 2013 IL 113307, ¶ 97.

¶ 32 Ultimately, the question before us is not whether we would reach the same conclusion as the trial court. Rather, the question is whether the trial court's determination that the new evidence was sufficiently conclusive was manifestly erroneous. Given the record before us, we cannot find that the trial court's ruling was indisputably erroneous. *Id*. ¶ 98. The court carefully reviewed the evidence, applied the correct legal standard, and explained why the newly presented testimony undermined confidence in the original verdict. Accordingly, the State has failed to demonstrate that the trial court's decision granting the defendant's amended successive petition for postconviction relief was manifestly erroneous.

¶ 33                                          III. CONCLUSION

¶ 34 For the above reasons, we affirm the trial court's order granting the amended successive petition for postconviction relief following a third-stage evidentiary hearing.

11

¶ 35    Affirmed.